STEWART, et al. v. HOOD, et al.

1. In this State, when an administrator *de bonis non* sues upon a note given to the administrator in chief, in that character, for goods of the estate, he is not responsible *de bonis propriis* for costs, as he necessarily sues in his representative character.

2. In a suit, where the question was involved, whether a slave was sound when sold by an administrator, the declarations of the intestate, the owner of the slave, that he was unsound, are admissible evidence, to show when the unsoundness commenced.

3. When the evidence before the jury is uncertain and indefinite in its nature, or as to the conclusions to be drawn from it, the court is not warrant-

Stewart, et al. v. Hood, et al.

ed, as a matter of law, to charge the jury that a case is made out for either party; the conclusions of fact must be ascertained by the jury.

4. When an interested witness is examined at the instance of the defendants, and cross examined by the plaintffs, the latter may read the deposition, although the former declines to do so.

Error to the Circuit Court of Pickens.

ASSUMPSIT by Stewart and another, as administrators *de bonis non* of B. G. Sims, deceased, against Garnett and another, as the makers of a note payable to one Gordon, administrator in chief of that estate. The defendants pleaded, 1. Non assumbsit. 2. Want of consideration. 3. Failure of consideration. 4. Fraud.

At the trial, the note was read to the jury, and appeared to be given on the 14th February, 1845, due on the 1st January thereafter. This was admitted by the parties to be assets of the estate, and to have been given to Gordon as administrator for a negro slave named Henry, bought by Hood at the administrator's sale of Sims' personal property; also that Gordon was personally present at the sale, and that Gordon died before the commencement of this action.

The defendants produced a witness who testified he first saw the slave in July, 1842, at the house of Sims, then living; that the slave was sick, and the witness, as a physician, was then called to see him. The slave was then laboring under an affection of the liver, and Sims told the witness the slave always had been delicate. The plaintiffs objected to the admission of this declaration, but the court let it in to the jury.

The witness further testified the next time he saw the slave was the 14th Feb. 1843, the day of the sale when Mr. Hood was taking him home after the purchase; the slave then had a sickly languid look, and any prudent observing man would have seen that something was the matter with him. Hood lived about six miles from the place of sale, and was taking the slave home on horseback behind him. The witness saw the slave about six weeks afterwards, in his ca-

pacity of physician, and then he was laboring under the same
disease as when seen at Mr. Sims' residence. The slave died,
as the witness understood, in July, 1843. His symptoms of
disease were aggravated, and in the opinion of the witness,
as a physician, the slave was unsound and worthless at the
time of sale. His disease was a chronic affection of the liver,
and his whole system sympathetically affected. Another
witness for the defendants testified he was living in Hood's
family on the night of the 14th February, 1843, when the
slave was brought home. The defendant told the slave to
bring in a stick of wood, and one of moderate size was brought;
witness noticed, that in laying the wood on the fire, the slave
reeled a little and breathed very hard ; that he moved lan-
guidly. Witness thereupon suggested to Hood the slave was
unsound, and asked Hood if such was the fact. Hood re-
plied, he had paid a sound price. This witness also testified,
the slave was of no use to Hood. Another witness, a physi-
cian, testified for the defendant, that he attended the slave
during his last sickness—considered him as laboring under
an affection of the heart, and also considered he was unsound
at the time of the sale. The slave died at the house of the
plaintiff, Stewart. Another witness for the defendant, testi-
fied he was the overseer for Sims in 1842 ; that in the sum-
mer of that year the slave was afflicted with what the family
thought were rheumatic pains. Gordon was the brother-in-
law of Sims, and lived neighbor to him, and was called over
twice to see the slave when confined with rheumatic pains.
Gordon was, quite intimate with Sims' affairs. Witness knew
the slave in South-Carolina, where he was delicate, and trou-
bled with a cough. Another witness testified that a few days
before the sale, he was at Gordon's house, to see about buy-
ing some of the slaves, amongst the rest Henry. Gordon
told witness Henry was unsound, and had been troubled
with rheumatic pains, but as he was only 15 years old, he
thought he would out-grow them. Gordon also said he meant
to buy the slave himself. Witness was present at the sale.
Gordon was not there. Witness asked the auctioneer, when
selling other slaves, if he was selling the property as
sound ; the auctioneer replied in the hearing of the crowd,
" we sell no other sort." Witness noticed the slave Henry

then looked as if something was the matter with him. From what the witness knew of the slave he would not have given more than ten dollars for him. The defendant further proved, that a few weeks before the slave died, he took him to Mr. Stewart's, one of the plaintiffs, to return him. Stewart declined receiving the slave, and the defendant went off with the slave, but after riding a few miles, determined to go back to Stewart's, who had acted as Gordon's agent on the day of sale, and leave the slave at all events. He did so, and the slave died in Stewart's possession. There was evidence subsequently, that the defendant had forced the slave on Stewart, who afterwards sued Hood, and recovered judgment for the board of, and attention to the slave from that time until he died. When the slave was taken the last time to Stewart, the latter said "will leave him," and told the slave to go to the kitchen. The administrator had been acquainted with the slave for five or six years before the sale, and continually, to the sale. The defendant also proved, that Gordon was a creditor of Sims' estate to the extent of $6,000, and that the estate was greatly insolvent. Here the defendant rested.

The plaintiffs then called a witness, who testified he was the auctioneer who sold the slave, and had no remembrance of having made the remarks testified to by the witness for the defendant, and if such were made, they were in jest only; that he expressly said the buyers must look out for themselves; this witness stated, he did not sell property that day which he knew to be unsound, without declaring the fact. The plaintiffs also proved by another witness, present at the sale, that he was within hearing during the whole sale, and heard no warranty made that the property was sound; he noticed the slave Henry, and knew from his looks he was unsound.

The plaintiffs then offered to read the deposition of Mrs. Gordon, the widow of Gordon, the administrator in chief, taken on behalf of the defendants, but cross-examined by the plaintiffs. On motion of the defendants this was excluded, on the ground that Gordon was the predecessor of the plaintiffs.

Here the plaintiffs rested.

The court instructed the jury, with other matters—

1. That if they believed the slave's disease, on the day of his sale, could have been discovered by the defendant, by due diligence, they must find for the plaintiffs. Whereupon the plaintiffs moved the court to charge, that from the evidence in this case they must find for the plaintiff. This was refused, and thereupon the plaintiffs excepted to the several rulings of the court against them.

The verdict was for the defendants, and thereupon judgment was entered for costs against the plaintiffs, to be levied *de bonis testatoris et si non de bonis propriis.*

It is now assigned that the court erred—

1. In rendering this judgment for costs.

2. In permitting the declarations of Sims, of the unsoundness of the slave to go to the jury.

3. In excluding the deposition of Mrs. Gordon.

4. In refusing the charge requested.

P. MARTIN and B. W. HUNTINGTON, for the plaintiffs in error, insisted—

1. That an executor or administrator, suing in right of his intestate, is not liable for costs. [2 Bay, 166 ; Jameson v. Lindsey, 1 Bailey, 79 ; Bordeaux v. Lane, 2 Ib. 6 ; Jameson v. Young, 2 Litt. 287 ; Holcraft v. Gentry, 2 J. J. M. 499 ; Chamberlain v. Spencer, 4 Conn. 550 ; Ketchum v. Ketchum, Ib. 89 ; Dig. 227, § 23 ; 2 Bing. 399 ; 7 Wend. 522 ; 1 Ib. 30 ; 1 Bailey, 370 ; 3 John. 249.]

2. The admissions of Sims were irrelevant, as the contract was not with him, nor any warranty by which his estate could be bound. If to fix a *scienter* on Gordon, they were incompetent, as he was not present when they were made.

3. Mrs. Gordon was a competent witness. She was not a creditor of Sims' estate, although her husband's administrator was. It may be too, that Gordon's estate was insolvent, and therefore nothing to divide to distributees. Under any circumstances, her interest is remote and contingent only. The interest of Gordon, in his lifetime, does not make the widow incompetent. [7 Term, 524 ; Caldwell v. Stewart, 2 Bailey, 574 ; Chambers v. Spencer, 5 Watts, 504 ; 4 Dev. 228 ; 3 C. & P. 558.]

Besides, the defendants had no right to speculate on the

testimony of an interested witness, and after ascertaining what the evidence will be, accept or exclude it at pleasure. When they elect to examine a witness in this condition, it is a waiver of the question of interest. Again, it is too late to object to a witness after she is sworn and has testified.

4. Whether or not Gordon was guilty of fraud, has no bearing on the issue. The 4th plea being in short, can only refer to fraud by the parties on the record. But under the facts there was no fraud committed, and as there could be no warranty implied, the court should have charged the jury, the plaintiffs were entitled to recover. [Ricks v. Dillahunty, 8 Porter, 133; Craddock v. Stewart, 6 Ala. Rep. 77; Steele v. Kinkle, 3 Ala. Rep. 352; Van Arsdale v. Howard, 5 Ib. 596; Macklin v. Gardner, 2 H. & G. 176; Heath v. Allen, 1 A. K. M. 442; Bell on Sales, 20 L. L. 97.]

E. W. Peck, contra, insisted.

1. The judgment for costs is proper, and according to approved precedents. The statute exempts administrators from costs when sued, but when they sue, there is no reason why they should not pay costs. [Minor, 111; 2 Lom. on Ex, 383.]

2. The admissions of Sims, that the slave was unsound, was evidence to show when the disease had its origin, if for no other purpose.

3. Mrs. Gordon is *prima facie* the distributee of her husband's estate, and that estate was shown to be a creditor of Sims' insolvent estate. Whatever sum then is raised by this suit must benefit her. The interest is apparent and direct. No case exists where the creditor of an insolvent estate has been permitted to increase the assets by his own testimony.

4. As to the charge, it is impossible to say the proof was such that the jury could draw no conclusion from it. Whether as a case of warranty or fraud, it was proper to be left to the jury, and the court could not, in the condition of the case, pronounce on it as a demurrer to evidence.

GOLDTHWAITE, J.—The question with respect to the form of the judgment for costs is not a material one, so far as the reversal of the judgment is connected with it, inasmuch

as it would be considered amendable if incorrectly entered. But the point is one of considerable importance, and may as well be decided now as at another time. At common law, no costs were due, either to the plaintiff or defendant. [Tidd's Prac. 945.] The English statute giving costs has never been construed to warrant them against administrators when they necessarily sue in their representative character, though it is said, if they sue on a contract made with them, in that capacity, or for a tort to the assets, after the death, they may be thus charged, as in these cases the action could have been sustained in their own right. [Tidd's Prac. 978.] Our statute merely declares, that in all civil actions, the party in whose favor judgment shall be given, shall be entitled to full costs, except where it is otherwise provided by law. [Dig. 316, § 20.] It is evident this does not give a more liberal mode of taxation than prevails in England, and without now undertaking to decide the point, it would seem that whenever an administrator may properly sue, in his representative character, the costs in all cases should follow the judgment; and as that is, that the defendant shall go hence, if the suit of the administrator, the costs to be recovered are in that capacity only. Here the party sues in his representative character, on a contract made with a previous representative of the estate. It is not contended the suit was improperly brought, and beyond that it may be said, it was not necessarily brought, inasmuch as no other title is stated than the succession to the administration. Under these circumstances we think, the judgment should have been entered *de bonis intestatis* only.

2. We cannot say the declarations of Sims, showing the slave was unsound during his lifetime, were irrelevant or improper to go to the jury. It was necessary to fix a period when the unsoundness commenced, or was admitted before a knowledge of that fact, as then existing, could be charged on Gordon who subsequently sold the slave. The admission seems to fall within the principle, that any owner is competent to admit the condition of property possessed by himself, and here the inquiry as to the soundness of the slave was involved, whether the defence rested on a warranty, or on the supposed fraud.

3. The evidence on which the cause went to the jury, was not so certain and definite in its nature, or the conclusions to be drawn from it, as to warrant the court, as a matter of law, in charging the jury, that it made out a case, either for the plaintiff or for the defendants. Under this condition of the proof, the conclusions of fact were to be ascertained by the jury, and the charge asked was correctly refused.

4. There are two aspects in which the supposed interest of Mrs. Gordon may be considered. 1. Whether her husband's estate might be liable on the supposed warranty, or fraud, in the sale of the slave. 2. Whether the supposed interest she has as a distributee of her husband's estate, to increase the distributable fund of Sims' estate—that being insolvent, and indebted to her husband's—is not too remote and contingent to disqualify her. In the first instance, it is clear, when called as a witness for the defendants, she would testify against her interest, and therefore it creates no objection. If the party to a suit will call an interested witness to depose in his favor, he certainly would not afterwards be allowed to discredit the witness; and the same rule, we think, would prevent the defendants here from asserting the supposed interest of the witness in the result of the suit, as an objection to the cross-examination, if the objection was made in open court. The question then comes to this: can the adverse party, who has cross-examined, use the deposition taken at the instance of the other party? We do not well see what reasonable objection there is to such a course. If the witness was examined in open court, it is very certain we should never hear the objection of interest from the party offering him, and there certainly is no good to result from a practice which will permit a party first to ascertain by actual examination, what a witness will swear, and then admit or exclude him at pleasure.

In chancery suits it has been held, that the complainant may not make out his case from the cross examination of the defendant's witnesses. [Smith v. Biggs, 5 Sim. 391.] The reason for this rule in equity is not very obvious, and is stated with some dissatisfaction, by a respectable writer on evidence. [Gresley, 287.] At law it has several times been ruled, that the opposite party may use the deposition when

he has been cited to attend the taking, and has cross-examin-ed. [Yeaton v. Fry, 3 Cranch, 335; Rogers v. Barnett, 4 Bibb, 480.] Whether exceptions may not exist to the rule, is a matter which we need not now examine, as there seems to be no circumstances intervening here, which were different when the examination was had, from what they were when the deposition was offered to be used.

For the error in excluding this deposition, the judgment must be reversed, and the cause remanded.