## JOHNSON AND WIFE, et al. v. COLLINS.

1. The right to enter land, under the pre-emption laws of congress, descends to the heir at law, if the occupant dies without performing the conditions imposed by these acts, and obtaining the title. The heir cannot call on the administrator to pay the purchase money to the government out of the assets of the estate, nor the widow to perfect her title to dower. Therefore, where, in such a case, the administrator paid the purchase money due the government, out of the assets of the estate, and took the title to the widow and heirs of the deceased, as tenants in common—held, that an order obtained by the administrator from the orphans' court, for the sale of the land, upon the representation that the estate of his intestate was insolvent, was void, and that the purchaser at the sale obtained no title to the land. That no trust upon the land resulted to the administrator, or the creditors of the estate, from the fact that the administrator paid the purchase money out of the assets of the estate. Whether, the administrator might enter upon, and sell the mere occupancy of the deceased— *quere.*

2. A penal bond, made by the widow, jointly with the administrator, to make the purchaser a good title to the land, estops her from asserting title against him, under the title derived from the patent from the government.

Writ of Error to the Court of Chancery for the 4th District.

THE case made by the pleadings and proof may be thus stated : The bill asserts, that Peter Martin, deceased, in the year 1833, occupied and cultivated the W. ½ of the N. E. ¼ of S. 26, T. 18, R. 4, East, in Marengo county, and resided on it on the 19th June, 1834, so as to bring himself within the provisions of the pre-emption act approved on that day, reviving the act of the 29th May, 1830 ; that before complying with the requisitions of the laws, and paying the minimum price, $1 25 per acre, he died, leaving surviving him his widow, (now the wife of the said Malaleel Johnson, and children, (plaintiffs in error,) in possession of the land ; that James Martin, (also a defendant to the bill,) shortly after be-

came administrator of Peter's estate, and paid out of said estate into the land office at Demopolis, the price, $1 25 per acre, and purchased said land in the names of said widow and heirs of Peter Martin, taking the receiver's certificate of payment to them as purchasers; that this purchase was made, and the certificate obtained "in favor of the widow and heirs, upon proof of the fact, and by virtue of the right which had before that time accrued to said Peter in his life-time;" payment being made out of the assets of the estate; and that shortly after, the said James Martin, administrator, &c. offered to sell said land to complainant, Collins, at $20 per acre, to which offer said Collins assented, provided a good title in fee simple could be secured to him; that James Martin assured him that such title could be made by obtaining a decree of the orphans' court for the sale of the land; that he, said James, agreed with Collins to institute proceedings for that purpose forthwith; that said James and Sarah Martin, (widow of Peter Martin, and now Sarah Johnson,) on the 2d day of February, 1836, agreed with complainant, that if he would pay $800 in cash for said land, (being half of the whole price of the land at $20 per acre,) and $800 more when the title and conveyance to him should be completed, they would become bound to him in a penal bond, that the title should be made to him; that accordingly, on that day, they did make and deliver to him their title bond to that effect, in the penalty of $3200, (which bond is appended as an exhibit to the bill;) that he, Collins, had ever since had possession of said land; that James Martin, as administrator, &c. did cause proceedings to be had in said orphans' court, to procure a sale of said land, on the ground that "it could not be equally, fairly and beneficially divided among the heirs of said Peter;" that a decree was made and a sale had accordingly, by commissioners appointed by said court, (a transcript of the proceedings in which is set forth and filed with the bill;) that at the sale, James Martin was the purchaser, at a less price than $1600, and thereupon conveyed the land, in compliance with his bond, to said Collins, and received the other $800, to wit, on the 20th February, 1839; that said James Martin applied the whole $1600 received by him from complainant, and which was as much as the land was worth,

to the payment of the debts for which, as administrator, he was liable; that Peter Martin's estate was insolvent, and so reported and declared, and that his creditors received the whole benefit of that payment by complainant for the land.

Collins then further complains, that notwithstanding the premises, the plaintiffs in error, to wit, the widow and children of Peter Martin, and Johnson, the present husband of the widow, have sued him at law, in an action of trespass to try titles to the land, and he prays for *subpœnas* and an injunction.

Appended to the bill as exhibits are—1, A copy of the title bond from James and Sarah Martin to Collins, describing a piece of land, not by any numbers, but as lying in the French grant, and as bounded, north by the lands of Manning, east by the lands of William T. Hoskins, south by the lands of John Collins, and west by the lands of Wm. B. Duval, and binding the obligors to make good and lawful title, free from all incumbrances, within a reasonable time.

2. A transcript of the record of the orphans' court, showing that James Martin, as administrator of Peter Martin, filed his petition, describing by numbers, &c. the W. ½ of the N. W. ¼ of S. 26, T. 18, R. 4, East, and the cultivation and residence of Peter Martin, thereon, and reciting that before the expiration of the two years, within which, according to the pre-emption law, he might have purchased said land as pre-emptor, he died, and the land was afterwards proved out by Sarah Martin, the widow, and entered by her and the heirs of Peter Martin, as tenants in common; she having paid for it with her money, and that of the heirs; and that said land belonged to the estate of Peter Martin, and could not be equally, fairly, and beneficially divided; wherefore petitioner prays that a day may be set for the hearing of said cause, and a guardian *ad litem* be appointed for the heirs, who are minors. A guardian *ad litem* is appointed, without notice, so far as appears by this record, to any of the children, and a decree to sell, and a sale made by commissioners appointed by the court, to James Martin, upon his giving his notes to the commissioners for $1360, the amount bid by him, which sale was afterwards confirmed by the court, and a conveyance made according to its order; the notes afterwards delivered

Johnson and wife, et al. v. Collins.

by order of the court, to him, as administrator, upon his giving bond and security according to law.

The answer of John Wesley Martin admits and says, that his "father, Peter Martin, as alledged, cultivated and resided on the W. ½ of the N. W. ¼ of S. 26, T. 18, R. 4, East; and that upon making proof thereof to the satisfaction of the register and receiver of public moneys at the land office of the United States at Demopolis, and paying for said land $1 25 per acre, to said receiver, the said Peter would probably have been permitted to enter and purchase said land." That without having done so he died, leaving said Sarah, his widow, and six children, of whom respondent was one, surviving him; that one of said children several years ago died, an infant and intestate, leaving his brothers and sisters his only heirs at law, all of whom are parties to this suit; that said widow and children of Peter Martin, resided with him on said land, and aided him in the cultivation thereof; that said land lay in the French grant, and had never been offered by the government at public sale, and therefore was not otherwise purchasable of it, than under and by virtue of the pre-emption laws, that the government granted the land to the widow and children of the said Peter, in consequence of his and their cultivation and residence upon it; shows the patent of the government to them by name, (describing them as the widow and heirs of said Peter,) as tenants in common, and not as joint tenants; admits that James Martin, administrator of Peter, advanced the price of said land ($100) out of the estate which was of said Peter, and paid it to the receiver; denies that the estate was insolvent, and says on the contrary, that it was more than sufficient by $8,000 or $9,000 to pay all the debts and funeral expenses of said Peter—a surplus sufficient to have supported the family and educated the children, who are all minors, and some of them of tender years; says that the estate has been squandered and wasted by the administrator, and perhaps other persons; that the land needed not to have been sold to pay the debts, (and therefore the sale was not petitioned for on that account,) or to maintain the children; and that after the estate had been grossly mismanaged and wasted by James Martin, the administrator, during several years, a subsequent administrator *de bonis non*

reported the estate insolvent, (respecting of course the property only that had come to his hands.) Further answering, this respondent says, that he was first informed by the bill of complaint, of the bargaining between Collins and James Martin, and of the making by the latter and Sarah Johnson, (formerly called Sarah Martin,) of the title bond to said Collins. He admits them however, and also the payment of the $1600 by Collins to James Martin, and the proceedings in the orphans' court, (of which neither he nor the other children, although some of them were more than fourteen years old, had any notice,) and the sale under the decree and conveyance by James Martin to Collins, by a deed covenanting to warrant and defend the title; but he insists that the orphans' court had no jurisdiction over the land, as estate which had belonged to Peter Martin, and that all the proceedings therein in respect to said lands, were *coram non judice*, and void. He says moreover, that having for several years resided in the city of Mobile, he has no knowledge of any settlement of his administration by James Martin; but has been informed, and therefore admits, that in an account in respect to said estate, filed in said orphans' court by James Martin, he charged himself with the said $1600. But respondent denies that such money either necessarily was, or ought to have been applied towards payments of debts due from said estate. And finally says, that soon after he attained the age of twenty-one years, he joined in the suit to recover the land, which is sought to be enjoined, &c. Prays also the benefit of a demurrer and plea.

The answer of Malaleel Johnson and wife, formerly Sarah Martin, is of the same effect with that of John W. Martin;— the said Sarah saying that she did not know, at the time the suit at law for the land was brought, that she had ever signed the title bond; says, as James Martin, a brother of her deceased husband, was administering the estate, and she had confidence in him, she was in the habit of signing any papers he requested her to sign, and supposes she signed the bond under those circumstances without knowing what it was; asserts that the estate was not only solvent, but solvent by from $6000 to $9000, as she knows from her own knowledge, and also by information from James Martin as administrator, &c.

The answer of J. W. Martin, as guardian *ad litem* for the minor defendants, denies all matters alledged in the bill in favor of Collins—and insists by way of a plea, that the orphans' court had no jurisdiction over the land, as a part of the estate of Peter Martin, and that the proceedings therein were *coram non judice*, and void, &c.

The cross bill of John W. Martin, and the other children of Peter Martin, alledges the same facts that are set forth in J. W. Martin's answer in respect to the W. half of the N. W. quarter of section 26, T. 18, R. 4, east, and of the cultivation and residence thereon, and that after the death of Peter Martin, it was granted by the United States to them and their mother, the widow of Peter Martin, as "tenants in common and not as joint tenants;" that it had been a long time in the possession and use of John Collins; that they sued him for it at law; that he thereupon filed his bill in chancery to enjoin from proceeding in said suit, setting forth the bargaining between him and James Martin in respect thereto, and the title bond made by the latter and their mother, the said Sarah Martin, and the proceedings in the orphans' court, and sale under its order, &c.; that until the filing of said bill, the complainants in the cross-bill had no knowledge, and had never heard of the making of said title bond : and that although, as they are advised, the proceedings in the orphans' court (having been *coram non judice*) are void, yet they cast a cloud about the title, and may make the land less valuable to them, &c.

Wherefore these complainants pray that these proceedings and the sale made, or attempted to be made, by virtue thereof, may be declared void, &c., and the said Collins to be ordered to deliver up to be cancelled, &c. his deed, and also that if it shall be found that said Sarah Martin, by the title bond aforesaid, or otherwise, has divested herself of the title acquired from the United States, and transferred it to Collins, or otherwise impaired the same, so that the action of trespass to try titles cannot be prosecuted, then the chancellor would decree a partition of said land, so that six-sevenths should be set apart, and possession thereof be delivered to these complainants.

And further, that Collins be required to account to them for rents and profits, &c. and for general relief.

Collins, in his answer to the cross-bill, re-asserts, so far as pertinent, the matters alledged by him in the original bill—and says in addition, that Peter Martin, in his life-time, appeared before the officers of the land-office at Demopolis, and asserted his right to enter said land, as pre-emptor, and offered to make proof thereof, and payment; that his claim "was not then allowed, or rather was held under advisement," until said officers should be instructed from Washington, whether the lands in the "French grant" were subject to entry and purchase under the pre-emption laws; that he died before such instructions came; that after the receipt of them, James Martin, as administrator, purchased and paid for said tract of land as aforesaid; and that a part (does not say how much) of the $1600 paid by Collins for the land, was laid out by James Martin of the purchase of the parcel of land in the names of the widow and children, whereon they now reside, &c.

It is ordered that James Martin be made defendant to the cross bill.

The evidence consists of—

1. The patent which grants the land to the widow and heirs (mentioning their names) of Peter Martin, and their *heirs*, as "tenants in common."

2. The deed from the commissioners appointed by the orphans' court, to James Martin, conveys "all the right, title, interest, claim and demand, which was of the estate of said Peter Martin, or after his death, descended to his heirs, and which the said commissioners, by virtue and authority of the power by the said order and decree in them vested, may and can convey," &c.

3. The deed from James Martin to Collins, conveys the land, with a *covenant to warrant and defend the title against all persons whatsoever*. From all liability under this deed and covenant, and on account of the land, Collins *released* James Martin.

4. James Martin (a witness for Collins) testifies as to the cultivation and residence of Peter Martin on the land; that he *left it with his family* about the 1st of December, 1834,

and died 3d of February, 1835: that deponent, as adminis-
trator of Peter Martin, in the spring of 1835, proved the resi-
dence and cultivation of the latter, according to the provis-
ions of the act of 19th of June, 1834, and with moneys raised
out of the assets of the estate ($100) paid the land out of the
land office in the names (as that was deemed most properly
to express the real condition of the title) of the widow and
heirs of Peter Martin; that deponent considered the land a
part of the estate of Peter Martin, and it was so treated by
him and the "family,"—and that so considering it, he sold
it to Collins, (as the tract was too small to be divided among
the children) at $20 per acre, or $1600 for the tract, on the
2d February, 1836; and Sarah, the widow, signed with de-
ponent the contract.    Deponent charged himself as ad-
ministrator, with the whole amount of sixteen hundred
dollars, because that was the sum for which he and said
Sarah had previously agreed to sell the land to Collins,
although he had bid for it at the commissioners' sale
only $1100: and applied $1000 of the $1600 toward pay-
ment of Peter Martin's debts; and the residue, $600, to the
purchase of a house and parcel of land, the conveyance of
which (this testimony is excepted to as not competent) was
made to the widow and children, who now reside on the
land.  [This evidence was excepted to because witness was
interested, and a party to the suit—and that part which re-
spects the purchase of other land, with $600 of the $1600, or
rather the proof of the conveyance of it, as alledged, by *oral
testimony*, was excepted to as incompetent.]

In reply to the cross-interrogatories, witness identifies the
children, proves that they were all minors: that the oldest
became 21 years old in 1842: that another one, Albert, died
childless in 1836 or 1837: that Peter Martin, at the time of
his death, was not living on the piece of land in controversy,
but had moved away from it; that this land lies in the "cane-
brake," and was not otherwise purchasable than by virtue of
the pre-emption laws;—mentions the property of the estate,
and that some was sold to pay debts of Peter Martin, and
some transferred to the succeeding administrator *de bonis
non:* says he cannot tell what was the amount of debt due

42

from Peter Martin at the time of his death; that deponent did not report the estate insolvent. "Another administrator having been appointed to act in his place:" that the assets of the estate " were not sufficient to pay the debts"—and after all the assets were applied in payment of the debts, there were still debts remaining unpaid.

On a re-examination upon cross-interrogatories, inquiring whether the insolvency of Peter Martin's estate was an insufficiency to pay the debts contracted by Peter Martin himself, or debts wastefully contracted afterwards, this witness says, he is under the impression that if the property had been sold soon after the death of Peter Martin, there would have been enough to pay the debts of the estate—but the fall of the negro property made the estate entirely insufficient; and he says in reply to the questions on behalf of Collins, that Peter Martih, in his life-time, claimed this land under the pre-emption law; that witness does not know that he ever offered to purchase the land at the land-office, and that Collins was to give him (witness) $1600 for the land, " if I (the witness) could have a sale made by order of the court."

Upon the third examination upon cross-interrogatories, this witness admits that the insolvency of Peter Martin's estate was not created by debts or liabilities contracted by himself, and those for funeral expenses, &c., that a large portion (answer to cross-interrogatory 4th) of the estate was expended in common store accounts, contracted after said Peter's death, and not necessary, or contracted for the preservation or security of the property of the estate: that although he thought said Peter's debts exceeded $5000, he did not think they exceeded $6000 or $7000; that deponent charged himself with the correct amount of the assets in the account which he filed in the orphans' court, as administrator of the estate, and that he did not think the assets, exclusive of the $1600, exceeded $8000.

5. The testimony of Woolf, the clerk, shows that the amount of assets with which James Martin charged himself, in the account referred to, was $12,816 07: also that the subsequent administrator *de bonis non*, had reported the estate insolvent.

6. The deposition of A. J. Crawford proves that he was

register of the land-office in Demopolis in 1834, and the proper officer to hear applications for the benefit of the pre-emption laws: that in the fall of that year, Peter Martin applied for leave to enter the W. half of the N. W. quarter of section 26, t. 18, r. 4, East, under the pre-emption act of the 19th June, 1834, and insisted with much importunity on his right to do so, offering to make proof of his cultivation and residence, and to pay the *minimum* price; that deponent refused to allow his claim, because he did not believe the lands in the "French grant" (where this piece lay) were subject to the pre-emption law, and would wait to know what decision upon this point should be made at the land-office department at Washington; that at the suggestion of deponent, said Peter suspended any further action in the matter until instructions upon this point should be received from Washington—and went away intending to return and renew his application, whenever it would be allowed; that said Peter did not actually deposit in the office, or tender, or show, the money, but deponent has no doubt he was able and ready to do so: that Peter Martin died 5th February, 1845: and the instruction to allow pre-emption privileges in the "French grant," arrived from Washington about the 1st April afterwards;—that soon after, the widow of Peter Martin, and James Martin, the administrator, came to the land-office, proved out said land under the pre-emption law, paid for it, and took the certificate of purchase to the "widow and children," because said Peter having died, it could not issue to any other person than them; that the claim of pre-emption was not allowed on account of any thing done by them, but because of the cultivation and residence of Peter Martin himself; which cultivation and residence were required to have been done and had, before the date of the law, (19th of June, 1834), and that the land in question was not otherwise purchasable, than by virtue of the pre-emption law, because it lay in the "French grant," and had never been offered at public sale by the government.

In another deposition, this witness (Crawford) says he knew Peter Martin well, and "he was not insolvent." (McCarty, receiver, proves no papers on file in the land office, relating to this claim.)

7. Sarah Johnson's deposition (to be used in the cross-suit only) proves the identity and ages of the children of Peter Martin; that deponent was his widow; that the estate was not insolvent at Peter Martin's death; and that she and her husband are parties to the original, but not to the cross-suit.

The other depositions relate to the value of the land, its rent, &c., and were intended to be used in case a reference had been made to the master, or a decree to account. Taliaferro proves that the land being all cleared, is less valuable than if half were wooded.

The chancellor considering justice to be on the side of Collins, and "the law to be questionable," perpetually enjoined further proceeding in the suit at law, and required the patent to be delivered to Collins.

This decree is now assigned as error.

A. R. MANNING, for plaintiff in error, insisted—

1. The orphans' court had no power to order a sale. [Wyman, et al. v. Campbell, et al. 6 Porter, 219; Clay's Dig. 224, § 16.]

2. The pre-emption act of 19th June, 1834, granted a privilege only, and the courts could not interfere in favor of an occupant, or settler. It was an act of bounty. [Wilcox v. Jackson, 13 Peters, 498; Rhea, Conner & Co. v. Hughes, 1 Ala. R. 220; McElyea v. Hayter 2 Porter, 152; Belle, et al. v. Payne, et al. 2 Stew. 413; Minter v. Crommelin, 9 Ala. R. 594; Wright v. Mullens, 2 S. & P. 221.] If the intestate, at his death, could not be compelled to take the land, his heirs (and of course creditors) cannot insist on paying for it with the funds of the estate. [Broome v. Monck, 10 Ves. 606, and cases there cited.]

3. There could be no resulting trust in favor of the creditors, any more than if they were aliens, or than it could be presumed in favor of a father. Besides the money with which the land was bought was the money of the wife and children, in the hands of the administrator, as trustee for them.

4. A *resulting trust* is not within the jurisdiction of an orphans' court. [Elliott v. Mayfield, 3 Ala. R. 231.] For the *existence* of the trust, (not its value,) would have to be first established.

5. Collins is not entitled to a decree. He must look to his covenants with James Martin for indemnification. [Cullum v. Br. Bank at Mobile, 4 Ala. 13.]

6. The proof about the purchase of other land, and the *conveyance* to the widow and children is not competent. And the money with which it was bought, belonging, after his contract with Collins, to James Martin, he had a right to pay it over to the creditors, or distributees of Peter Martin's estate, (the assets of which he had wasted,) or to any other of his creditors.

7. The *bill* does not alledge that Peter Martin intended to become a pre-emptor, or the pretended purchaser of other lands for the widow and children.

8. The release of James Martin precludes Collins from a decree against the other defendants to his bill. [Thompson v. Harrison, et al. 1 Cox's C. C. 344.]

John T. Lomax, for defendants in error, insisted—James Martin is a competent witness for Collins. No relief is prayed against him. No decree in the case could affect him. His only interest was in the warranty to Collins, and from which he was released. His interest, if any, is adverse to Collins. He is still liable to the heirs on his bond in the orphans' court, for application of the fund arising from the sale of the land. [Johnson v. Cunningham, 1 Ala. R. 249.]

As to the application of the money to the purchase of land for the children, he can speak without the deed taken to them. Nothing evidenced by the deed is in issue. It is a collateral fact. [Smith v. Armistead, 7 Ala. R. 698, and cases cited.] He speaks as to the fact of payment only, which the deed would only corroborate, as would a receipt. [Johnson v. Cunningham, *supra.*]

When Peter Martin had complied with the conditions of the act of congress, he asked not a privilege, but was entitled as a right to a patent from government. And had his right in this respect been violated, even by the act of government, his petition would have afforded effectual redress. But the question was not with the government, but with its officers, whom Martin could have reached by mandamus.

Though it was optional with Martin to have perfected his

title, he had signified his intent to do so, and made tender of the money, and his administrator but carried out and completed the act. [Earl of Radnor v. Shafto, 11 Vesey, 448.]

Martin considered this land as constituting part of his estate, and may have obtained credit upon the faith of it. The government recognized his estate in the land as descendible, and the patent was issued accordingly. The heirs claimed the land in their representative character.

The heirs could have compelled the administrator to perfect the title as if the father had contracted for it. [Champion v. Brown, 6 J. Ch. R. 398; Jackson, ex dem. v. Scott, 18 J. R. 94; Jackson v. Parker, 9 Cowen, 73.]

The administrator could not have made a purchase with the funds, of a new title, and if he did, the land retained the character of the money thus converted, and subject to the same incidents. And in taking the title to the heirs, there was still a trust resulting to the administrator, as such, and it remained subject to his disposal.

Collins was in no respect responsible for the application of the purchase money by the administrator. If the heirs have any rights, their remedy is on the bond filed by Martin to entitle him to the possession of the fund, and also upon his bond as administrator.

Whatever rights the widow may have had, have been vested in Collins, by her contract with him.

GOLDTHWAITE, J.—1. The complainant's title to relief, depends chiefly on the question, whether Peter Martin had such an interest in the land settled and cultivated by him, as was the subject of sale by his personal representative after his death. We state the question in this way, because it seems evident that no subseqpent action of the widow, or heirs, with reference to the land, could change the rights of the administrator, and through him the creditors, if they had any.

It will be seen, on looking to the act of Congress, of the 29th May, 1831, and of June 19th, 1834, that the bounty of the government is not extended by express terms, to either the heirs or the personal representatives of the person entitled to the pre-emption. The privilege of entry, at the mini-

Johnson and wife, et al. v. Collins.

mum price, is given to every settler or occupant of the public lands, who was in possession at the time of the enactments, and who cultivated the lands—by the first act, in 1829, or by the last, in 1833. [Land Laws, p. 1, 473, 525.] The construction of these acts, in the general land office, seems to have been that the pre-emption right in the event of the death of the settler previous to any abandonment of the lands, and before the entry was actually made, descended to his heirs at law. [See instructions, 23d October, 1833, Land Laws, p. 2, 582.] Such a construction of these acts, seems to be in entire accordance with principle, for it is common learning, that conditions annexed to an estate, descend to the heir, and he alone can take advantage of them. [Bacon's Ab. tit. Heir, C.] If the pre-emption acts are analyzed, it will be seen they grant a privilege to the settler, which may ripen into an estate in fee, if the prescribed condition of making proof, and paying the minimum price, is performed. Nothing can be more clear, however, than that this privilege is not in the nature of a contract, nor could the personal representative be compelled, in any manner, to appropriate the funds of the estate, to make the entry. The legal analogies, which in reality control this case, although remote, and of rare occurrence with us, are free from dispute, and entirely decisive. It is the well known rule of equity courts, to consider that done which is contracted to be done, and under its influence, decisions are numerous in the English courts, to compel an appropriation of the personal effects by the administrator, for the benefit of the heir or widow, to pay for lands contracted to be purchased, but not paid for, or the title passed by the execution of the necessary assurances. [Sugden on Vend. ch. 4, 211 ; see also, Champion v. Brown, 6 Johns. Ch. 398.] This rule is comparatively unimportant with us, when the same person is usually the distributee of the personal estate and heir to the real, and where too, lands are chargeable with simple contract as well as specialty debts. Yet its existence is so interwoven with the entire equity system, that it never can be lost sight of, although the cases may be rare in which its application will prevent one party from participating in a fund otherwise distributable to him, and transfer it to another, who, without the rule, would have

no rights.   Although the rule referred to is of universal ap=
plication, it is applied only to contracts, and these must be
valid in point of law, to warrant the heir in claiming the ap-
plication of the personal estate to pay for lands.   [7 Vesey,
341.]   The liability of the real and personal representatives,
*in respect of a contract, is, that of the party at the time of his
death* ; if he could not then be compelled to take the estate,
the heir cannot insist on having it, or that the personal estate
shall pay for it.   [10 Vesey, 607.]   These cases show clear-
ly, that the heir (assuming that his rights here are of the
same nature as by the common law,) could not call on the ad-
ministrator to pay for the land.   Nor (to take the case, in
which it is possible the rule might be invoked with us) could
the widow call on either heir or administrator, to pay for the
land, to secure her dower interest in it.   There then being
no obligation on Martin to pay out the land, his administrator
was not authorized to do so, and if he had thus appropriated
the funds of the estate, in our judgment, he would have been
responsible in the event of a loss.   So far then as the title to
the land is concerned, we are constrained to say there was
nothing which could pass by the sale, under the decree of
the orphans' court, affecting the title now shewn by the heirs
of Martin.

But, it may be asked, is it possible that one can have an in-
terest in lands which is really beneficial, but which cannot
be reached by a creditor during the life-time of his debtor,
or even after his death be appropriated to discharge the debt ?
The answer is that the government of the United States has
the sole disposition of the public lands, and if it chooses to
permit its citizens to occupy them until actually sold, the
creditor has no more right to complain than he would of the
charity which gives his debtor shelter elsewhere.   It is the
settled law of this court, that a settlement and improvement
on public lands, is not the subject of levy and sale under ex-
ecution.   [Rhea, Conner & Co. v. Hughes, 1 Ala. Rep. N. S.
219.]   Whether the mere occupation might not be entered
upon, held, or sold by the administrator, is a point which has
never yet been presented, and therefore we decline to ex-
press an opinion upon it, further than we have already done.
Conceding, however, the right so to enter, and to hold the

possession, or take the emblements, it seems clear that by a sale of it, the administrator could not pass the settler's right of pre-emption to the purchaser, or in any manner affect that of the heir.

There is another view which is pressed with much ability by the complainant's counsel, and it is, that as the funds were provided by the administrator, from the estate, that a trust results either to him or to the estate, and thus the equitable right to the land is conveyed by the deed. This would possibly be answered by the proof, that the purchase, instead of being made by the administrator, was, in point of fact, made by the widow and heirs; but, without placing any stress on this fact, it seems to us that such a trust would be directly against the policy of the pre-emption acts; as the bounty of the government was obviously intended for the settler and his heirs. A construction, therefore, which would make him or them trustees for the person advancing the purchase money, is not to be tolerated, as it would, in effect, transfer the bounty of the government from the settler to the lender of the money.

It is perhaps unnecessary to advert to this matter further, but as an equity may be supposed to arise, that the money advanced by Martin out of the funds of the estate, shall be accounted for by the heirs, we shall content ourselves with the remark, that it more properly falls under the head of payment by the administrator to them. Even if the estate administered by Martin, was insolvent, and its assets had not been squandered, we should doubt if the complainant would have any right to be considered as entitled to re-payment, as standing in the place of the administrator.

There can be no question, we think, as to the complainant's right to relief, in the present aspect of the case, as against the legal title vesting in the widow under the patent. This she is concluded from insisting upon, by the bond which she entered into; but the decree must be so made as not to permit this to affect the future conducting of the suit at law.

The decree of the chancellor must be reversed, and the cause remanded, for such further proceedings as will conform to the opinion now pronounced. Reversed and remanded.