LEWIS v. LOVE & LANE.

1. The treaty entered into between the Chickasaw Nation of Indians, and the United States on the 20th October, 1832, stipulates that no one, not a Chickasaw, or connected with the Chichasaws by marriage, shall be permitted to settle on any of the land ceded by that treaty, until the same had been sold by the United States. It was not therefore permissible for a reservee, by a lease or sale of his reservation, to introduce into the nation, one who was inhibited by the treaty from settling upon the unsold lands.

2. An agreement was entered into in August, 1833, between the defendant Love a reservee under the treaty, and the plaintiff in error, for the lease of his reservation, for several years, unless sooner required by the United States, to abandon the possession; and stipulating, also that if the treaty should be so modified, as to permit a sale by the reservee, the lessee or his heirs, should have the preference in the purchase, at such price, &c. as the reservee might prescribe. It was held that the treaty of 1834, which conferred the right of sale upon the reservee, did not impart validity to the contract, which was invalid when made,

3. The agreement to give to the plaintiff the preference in the purchase of the reservation, at such price, and on such terms as the defendant, Love, might prescribe, did not impose upon the former, an obligation to become the purchaser. Thus far there was no reciprocity; and the stipulation to offer to sell, being uncertain and incomplete in its details, cannot be specifically enforced.

This case comes here by writ of error, from the Chancery Court holden at Moulton.

ON the 16th August, 1833, the plaintiff in error entered into a contract in writing, with the defendant Love, by which Love leased to the plaintiff, for the term of three years, from the first of January, 1834, two sections of land situate in the county of Franklin, to which he was entitled as a reservation, under the treaty concluded between the United States and the Chickasaw Nation of Indians, on the 20th October, 1832. By the terms of the contract, the plaintiff was to retain the possession of the land, until the expiration of the period of the lease, unless persons occupying Indian reservations, should be sooner required

to abandon them; in which event he stipulated to surrender the possession, together with all improvements made on the land, to the Chickasaw Nation.

It was further agreed by the plaintiff and Love, that if the treaty should be so modified as to give to the latter a title, in fee simple, or in any manner authorise him to dispose of the land, then the plaintiff, or his heirs, should have the preference in the purchase of the same, at such price, and on such terms, as Love might prescribe.

It is further alleged in the plaintiff's bill, that on or about the 24th May, 1834, the treaty of 1832, was so modified by the United States and the Chickasaw Nation, as to authorize Love to sell and convey his reservation in fee simple, but by the regulations of the Executive Department of the Government sales by the Indian reservees, were not recognised as binding upon the sellers, before the 31st day of March, 1836. Notwithstanding this modification in the treaty, and the contract of Love to give to the plaintiff, the preference in the purchase of his reservation at the price he, (Love) might fix thereon, the same was sold to the co-defendant Isaac Lane. The plaintiff avers that Love did not give him the preference in the purchase; that Lane purchased the reservation with a full knowledge of the stipulation contained in the written lease, and with notice that the plaintiff was willing to take the land at the price at which he became the purchaser.

The plaintiff further states that the main inducement on his part, to entering into the contract with Love, was the preference agreed to be given him, in the purchase of his reservation. In view of that object, he made extensive improvements before the sale to Lane, which greatly enhanced the value of the land. Notwithstanding all which, the defendant, Lane, had recovered a judgment against the plaintiff in the Circuit Court of Franklin, by which there was adjudged to him the right of possession, as also damages, in consequence of the plaintiff's occupancy.

The bill concludes with a prayer that an injunction may be awarded, to stay execution of the judgment at law, and that the

Lewis v. Love & Lane.

plaintiff have the full benefit of the stipulation contained in his contract with Love, upon paying the sum at which Lane purchased the land. An injunction was awarded to suspend proceeding upon the judgment, and the defendants severally answered the allegations of the bill, but as these answers were not considered in the Court of Chancery, and as it was not thought necessary to look into them, here, it is needless to enlarge this statement, by a particular recital of them.

The Court of Chancery having dismissed the bill, because its allegations do not entitle the plaintiff to the interposition of equity, the correctness of that decree is the question here examined.

ELLIS, for the plaintiff.
HOPKINS, for the defendant.

COLLIER, C. J.—By the 4th article of the treaty made between the United States and the Chickasaw nation, on the 20th October, 1832; it is provided, that if the nation should fail to procure a country to remove to, and settle on, previous to the first public sale of the land, which by that treaty, they had ceded to the United States, then and in that event, they are to select out of the surveys, a comfortable settlement for every family in the Chickasaw nation. "All of which tracts of land so selected and retained, shall be held and occupied by the Chickasaw people, uninterrupted, until they shall find and obtain a country suited to their wants and condition." And when they shall determine to remove from said tracts of land, the Chickasaw nation will notify the President of the United States of their determination; and thereupon, as soon as the Chickasaw people shall remove, the President will proclaim the said reserved tracts of land for sale at public auction and at private sale, on the same terms and conditions, as is provided for, in the second article of this (that) treaty, to sell the same, and the nett proceeds thereof, to be paid to the Chickasaw nation, as is provided in the third article of this (that) treaty."

The fifth article of the treaty stipulates for the payment by

the United States, of the value of improvements made by the heads of Indian families on their reservations. It is also stated that "the provisions of this article are intended to encourage industry, and to enable the Chickasaws to move more comfortably. But lest the good intended may be abused by designing persons, by hiring hands, and clearing more land than they otherwise would do for the benefit of their families, it is determined that no payment shall be made for improved lands, over and above one eight part of the tract, allowed and reserved for such person to live on and occupy."

At the request of the Indians it was "agreed that no person whatsoever, who is not a Chickasaw, or connected with the Chickasaws by marriage, shall be permitted to come into the country and settle on any part of the ceded lands, until they shall be offered for sale, and then there shall not be any person permitted to settle on any of the land, which has not been sold at the time of such settlement, and in all cases of a person settling on any of the ceded lands, contrary to this express understanding, they will be intruders, and must be treated as such, and put off the lands of the nation." (15 Art.)

The several articles of the treaty we have cited, clearly indicate that sales of reservations, whether for a limited or indefinite period, were calculated to oppose the express understanding and agreement of the parties. The fifth Article attempts to provide, that no more land shall be cleared than was necessary for the reservee's family, while the fifteenth article declares that any one not a Chickasaw, or connected with the Chickasaws by marriage, shall not be permitted to settle on any of the ceded land, until the same has been sold. The first Article of the treaty cedes to the United States, all the land which the Chickasaws own "on the east side of the Mississippi river, including all the country where they at present (that time lived) live and occupy." Thus it appears, that not only the land not embraced by the reservations, but even the reservations themselves were ceded to the United States, and persons occupying the same, who did not come within the exceptions of the fifteenth article were to be regarded as intruders.

Lewis v. Love & Lane.

The stipulation in regard to intrusions upon the Indian territory, was made by the United States in favor of the Chickasaw nation, and its observance concerned the entire tribe; consequently, it was not permissible for any reservee, by a lease or sale of his reservation, to introduce into the nation, one who was inhibited by the treaty from settling upon the unsold land. The sale of land to which the fifteenth article refers, as giving license to settle, is most clearly the sale to be made by the United States; for the treaty contemplates and provides for that, without authorizing any other, either directly or indirectly.

But we need not consider further the influence of the parts of the treaty cited, upon the rights of the plaintiff, as the supplementary and explanatory articles agreed upon, between the United States' commissioner and the Chickasaw Nation, on the twenty-second day of October, 1832, are express upon the right of the reservee to sell.     After reciting the fourth and fifth articles, they proceed as follows: "It is now proposed and agreed to, that no family or person of the Chickasaw Nation, who shall or may have tracts of land reserved for their residence, while here, shall ever be permitted to lease any of said land, to any person whatsoever, nor shall they be permitted to rent any of said land to any person, either white, red, or black, or mixed blood of either.     As the great object of the Nation is, to preserve the land and timber, for the benefit of posterity, provided the Nation shall continue to live here; and if they shall, at any time, determine to remove and sell the land, it will be more valuable, and will sell for more money, for the benefit of the Nation, if the land and timber be preserved."     Now, here is an express inhibition, that the reservees, under the treaty, shall neither sell or lease their reservations.     The contract then, between the plaintiff and Love, whether considered as a lease or sale, was clearly void, and the occupancy by the plaintiff, in derogation of the stipulations of the treaty between the United States and the Chickasaw Nation.

Upon the hypothesis, that the contract was invalid in its inception, it was argued for the plaintiff, that the treaty entered

into between the United States and the Chickasaw Nation of Indians, on the twenty-fourth of May, 1834, removed the restriction upon the right of lease and sale by the reservee; and that, therefore, the agreement to give to the plaintiff the preference in the purchase of the reservation, became operative in law. With out undertaking to examine the effect of the treaty of 1834, we are satisfied that it cannot impart validity to a contract which was invalid, by the treaty of 1832.

The case of McElyea v. Hayter, (2 Porter's Rep. 148) is in principle, strikingly analagous to the present. That case arose under the pre-emption act of Congress of May, 1830. McElyea entered a half quarter section of land, and previous to the issuance of the patent, executed a letter of attorney to Campbell, authorizing him to convey the land to Hayter, when the patent should issue. Campbell executed the conveyance, and Hayter brought an action to recover the possession. The Court held, that inasmuch as the pre-emption act declares " that all *assignments and transfers* of the right of pre-emption given by this act, prior to the issuance of the patents, *shall be null and void,*" the contract to convey to Hayter was absolutely void, and the deed of McElyea, executed through Campbell, as his attorney, passed no title.

In that case it appeared, that an act of Congress passed in 1832, subsequent to the contract between McElyea and Hayter, removed the restraints upon transfers, by providing that *after that time*, all persons who had availed themselves of the right of pre-emption under the former act, might assign and transfer their certificates of purchase or final receipts ; and that the patents might issue for the lands in the name of such assignee. The court considered that the letter of the attorney to Campbell, implied a contract of assigning and transferring the right of pre-emption at the time of its execution, and that the purchaser was in a predicament quite as unfavorable, as if the conveyance had been at that time.

In the case at bar, the contract between the plaintiff and Love, was directly opposed to the treaty of 1832, and was void, as being adverse to its policy, and the interests of the United States,

and the Chickasaw nation. Such being the character of the contract so far as it operated *in praesenti* as a lease, or sale, it could upon the authority of the case cited, derive no aid from the treaty of 1834.

But it is insisted for the plaintiff, that though the contract with Love, considered as a lease or sale may be void ; yet, as it repects the stipulation to give to the plaintiff a preference in the purchase, when the restriction upon the right of sale was removed, it was not opposed to the treaty, nor any other law. It was not an undertaking to do an unlawful act, but an agreement to do an act when, (and not before) it should become lawful.

Without pretending to consider the justness of the conclusion, in the abstract, which this argument assumes, we think it clear, that the agreement cannot be specifically enforced. The agreement does not amount to a contract to sell, but merely to a stipulation to offer to sell to the plaintiff, at such price, as Love was willing to take ; without a corresponding undertaking by the plaintiff to purchase. There was no reciprocity in the stipulation of Love, and consequently he could not compel the plaintiff to become the purchaser of his reservation, but it was left to his mere pleasure, whether he would purchase or not.

It is a well ascertained rule in the law of contracts, that the assent or consent of the parties must be mutual. Every agreement ought to be so certain and complete, that each party may have an action upon it : and the agreement would be incomplete if either party withheld his assent to any of its terms. The agreement must, *in general*, be obligatory on both parties, or it binds neither. So an agreement to be entitled to be carried into specific execution, ought to be certain, fair, and just in all its parts. (Chitty on contracts, 4 ; 2 Story's Eq. 79 ; Goodwin v. Lyon, 4 Porter's Rep. 297.)

Taking the principles we have laid down as our guide, and it is clear that the plaintiff has not shown a contract that should be specifically enforced—it does not show the price at, and the terms on which the sale should be made, but leaves it discretionary with the plaintiff, whether he will purchase at any price.

The decree of the court of chancery must be affirmed.