Pettit's Adm'r v. Pettit's Distributees.

## PETTIT'S ADM'R vs. PETTIT'S DISTRIBUTEES.

[BILL IN EQUITY FOR SETTLEMENT OF ADMINISTRATION.]

1. *Jurisdiction of orphans' court to sell decedent's real estate.*—Under the act of 1822, (Clay's Digest, 224, § 16,) the orphans' court had no jurisdiction to order the sale of a decedent's real estate, for the purpose of paying debts or making equal distribution, when the petition for the sale failed to show that the decedent, at the time of his death, had or owned some right or interest, either legal or equitable, in the lands proposed to be sold, which was in its nature descendible to his heirs.

2. *Construction of treaty of 1832 between United States and the Chickasaw Indians.* The treaty of 1832 between the United States and the Chickasaw Indians, with the supplementary and explanatory articles, (U. S. Statutes at large, vol. 7, pp. 381–90,) did not invest the reservees with the title to the reserved lands, but clearly prohibited each reservee from selling or leasing his reservation.

3. *Validity of contract for sale or lease of Indian reservation.*—A contract between a Chickasaw Indian, who was entitled to a reservation under the treaty of 1832, and a white person, by which the former, in consideration of a specified sum, part of which was paid in cash at the time the contract was made, agreed to sell his reservation to the latter, in the event of the treaty being so modified as to allow the sale, and, "in case there is no alteration of the treaty," to let the latter "have the use and benefit of the said lands for two years, free of rent,"—is void, because contrary to the provisions and policy of the treaty of 1832.

4. *Validity and confirmation of contract founded on consideration partly illegal.*—An entire contract, founded upon a consideration which is partly illegal, is void, and incapable of confirmation.

5. *Proceeds of void sale not assets in administrator's hands.*—The proceeds of the sale of a decedent's real estate, made under an order of the orphans' court which was void for want of jurisdiction, are not assets in the hands of the administrator.

6. *Validity of bond given by administrator for application of proceeds of sale of land.* A bond given by an administrator, conditioned as required by the act of 1822, (Clay's Digest, 224, § 20,) is void, when the orphans' court had no jurisdiction to order the sale.

7. *Liability of sureties on such bond.*—The special bond required by said act of 1822 being "conditioned for the faithful payment and application of the money arising from such sale according to the final decree," the sureties therein are not liable for the waste or misapplication of the money by the administrator, unless the final decree directed its payment and application.

8. *Liability of sureties on general administration bond.*—The sureties on a general administration bond, conditioned as by law required, are liable for the waste or misapplication by their principal of money, arising from the proceeds of a valid sale of the decedent's real estate, which went into his hands on his execution of the special bond required by the statute under which the sale was made ; it appearing that the sureties on such special bond, in consequence of the failure of the final decree to direct the application of the money arising from the sale, are not liable for its waste or misapplication.

9. *Interest charged against administrator.*—On the settlement of an administrator's accounts in equity, the chancellor should decree interest on the balance reported against him by the master, from the day up to which the master computed interest, until the rendition of the final decree.

APPEAL from the Chancery Court of Franklin.

Heard before the Hon. JOHN FOSTER.

The material facts disclosed by this record are these:

In December, 1833, Hugh Pettit entered into a written contract with one John McLish, a Chickasaw Indian, which was in these words:

" This agreement, made this 2d day of December, 1833, between John McLish, of the first part, and Hugh Pettit, of the second part, witnesseth: That whereas the said parties did, on the — day of April, 1833, enter into a contract concerning the plantation of the said McLish, lying in that part of the Chickasaw nation included in the county of Franklin and State of Alabama, by which contract it was agreed between the said parties, among other things, that in case the said McLish should get a

title in fee-simple to the land upon which the said plantation was situated, and that the said McLish should wish to sell the same, he would give the preference to said Pettit; all of which will more fully appear by reference to said contract; and a survey having been made of the Chickasaw lands in said county, and the said McLish having selected for his reservation section four in township four, and section thirty-three in township three, both in range thirteen, west, which reservation includes the improvements of said McLish; and whereas it is expected that the Government of the United States will so alter or modify the treaty made with the Chickasaw nation, as to give the said McLish the said lands in fee-simple, with power to sell the same: Now, in case such alteration or modification of said treaty should take place, the said McLish agrees to sell to said Pettit the two sections of land heretofore mentioned, and to make to said Pettit, his heirs or assigns, a good and legal title for the same, by deed of conveyance to be executed within two months after the ratification of said alteration in said treaty ; in consideration whereof, the said Pettit binds himself to pay to the said McLish the sum of $12,800, as follows : $1,000 paid this day, the receipt whereof is hereby acknowledged ; $5,400 when said deed of conveyance is made ; $3,200 twelve months thereafter, and $3,200 two years thereafter. And in case there is no alteration in the treaty, the said Pettit has the use and benefit of the said plantation above mentioned, for two years, free of rent; and the said McLish has the use of the above mentioned $1,000, free of interest, and to pay the said Pettit the $1,000 out of the moneys arising from the valuation of said improvements on the plantation. In witness whereof," &c.

A few days after this contract was made, to-wit, on the 10th December, 1833, Pettit and M. Tarver entered into a written agreement, by which it was stipulated, that this purchase should enure to their joint benefit, that the payments should be made by them in equal proportion, and that the land should be held by them in common until they mutually agreed to divide it. The treaty with

the Chickasaw Indians was modified, as contemplated by the contract between Pettit and McLish, in May, 1834. See U. S. Statutes at large, vol. 7, p. 451. Pettit occupied the land, under the contract, until his death, which occurred in August, 1834. Letters of administration on his estate were granted by the orphans' court of Franklin county, on the 10th September, 1834, to Micajah Tarver, who thereupon gave bond, with Armstead Barton and Thomas Keenan as his sureties, and entered on the duties of the administration. Tarver took possession of the land soon after the death of Pettit, paid the entire purchase-money due under the contract, ($5,200 being paid by him as administrator, out of the assets of Pettit's estate,) and, on the 15th April, 1836, procured conveyances of the land from McLish; taking the title to section thirty-three to himself, and the title to section four (except twenty acres, as to which no title could be obtained) to himself, as party of the second part, "for the use and benefit" of Pettit's infant children.

On the 14th October, 1835, Tarver returned to the orphans' court a "statement showing the condition of the estate" of his intestate, which showed an excess of debts over personal assets amounting to more than $8,000; and prayed an order for the sale of a house and lot in the town of Tuscumbia, for the payment of the debts. On his petition, the court granted an order of sale, and appointed commissioners to conduct it. The sale was made by the commissioners on the 24th October, 1836; and the proceeds of the sale, amounting to $3,155, went into the hands of the administrator. In 1838, the administrator filed another petition in said orphans' court, alleging that it was necessary to sell said section four, a part of the lands obtained from McLish as above stated, for the purpose of paying the debts of the estate, and to make equal distribution among the heirs. The contract between McLish and Pettit, for the sale and purchase of the former's reservation, was made an exhibit to the petition, which stated all the facts, as above set out, concerning the agreement between Pettit and Tarver relative to the land, the payment of the purchase-money to McLish, and

the execution of the conveyances by him; alleged that
the administrator's object, in taking the deeds as stated,
was to make a division of the lands between himself and
Pettit's heirs; and prayed a confirmation of such division,
and an order for the sale of said section four, for the two-
fold purpose of paying debts and making equal distribu-
tion.   On the 1st October, 1838, the court rendered a
decree of sale, and appointed commissioners to carry the
decree into effect.   The sale was made by the commis-
sioners on the first Monday in December, 1838, and was
confirmed by the court on the first Monday in January
following.   The land brought at the sale over $9,000, one
half of which was paid by the purchaser in cash, and for
the residue a note with sureties was given, payable in
twelve months.   On the confirmation of the sale, for the
purpose of obtaining the proceeds, the administrator exe-
cuted a bond, as required by the statute, with Clark T.
Barton and George W. Carroll as his sureties, in double
the amount of the purchase-money, conditioned to be
void "if the said Tarver, administrator as aforesaid, shall
faithfully pay and apply the money arising from the sale
of said land according to the final decree, or according to
the law in such cases governing."   On the execution of
this bond, the proceeds of the sale, consisting of the pur-
chaser's bond and the money paid in cash, went into the
hands of the administrator, under an order of the court;
and he collected the amount due on the purchaser's note.

In 1840, or 1841, the administrator left this State, and
removed to Missouri, without having made a settlement
of his administration on Pettit's estate.   Proceedings
were afterwards instituted in the probate court against
him, as a non-resident, to compel a settlement of his
accounts, and he there filed an account-current for settle-
ment; but these proceedings were abandoned by the dis-
tributees, who, in September, 1852, filed a bill in chan-
cery to compel a settlement, charging the administrator
with a failure to return an inventory of his intestate's
estate, misapplication of the assets, &c.; stating particu-
larly all the facts relative to the sale of the land, as above
set out; alleging that Thomas Keenan, one of the sure-

ties on the administrator's general bond, had removed to Texas, and there died, insolvent,—that Armstead Barton, the other surety, had also died, after having executed his last will and testament, wherein he appointed William Dickson, Arthur C. Barton, and John W. Rutland his executors ; and that Clark T. Barton, one of the sureties on the special bond given for the proceeds of the sale of the real estate, had also died; and that George W. Carroll, his co-surety on the bond, was his executor. The administrator, the executors and heirs of Armstead Barton, and George W. Carroll, both individually, and as executor of Clark T. Barton, were made defendants ; and the prayer of the bill was for an account and final settlement of the administration, in which the administrator and his sureties might be charged with the proceeds of the sale of section four, in addition to the other assets of the estate alleged to have been wasted and converted by him ; or, if the chancellor should deem the sale of said land null and void, that he would decree a partition and division of the two sections in accordance with the terms of the written contract between Pettit and Tarver.

The chancellor sustained a demurrer to the bill, for multifariousness, but gave the complainants leave to elect on which feature of their bill they would proceed ; and the bill was afterwards amended, under the leave thus given, so as to claim a settlement of the entire administration.

The administrator answered the bill, denying the charges of waste, misapplication of assets, &c., and exhibiting an account of his administration ; and his answer was adopted by the other defendants, so far as it related to the matters of account. The defendant Carroll also demurred to the bill for want of equity, assigning several grounds of demurrer, which are stated in the brief of the appellant's counsel. On final hearing, the chancellor rendered a decree for the complainants, for a balance of $205 of the intestate's personal estate, the proceeds of the sale of the house and lot in Tuscumbia and section four, and interest on these several items up to the 1st May, 1855, the day on which the account was stated by

the master; also, refusing compensation to the administrator, and taxing the costs against him and the executors of Armstead Barton.

From this decree the defendants appeal, and assign several errors in the rulings of the chancellor, which are presented in the brief of their counsel; while there is a single cross assignment of error by the complainants, founded on the chancellor's omission to decree interest on the balance against the administrator up to the day on which the final decree was rendered.

JOHN A. NOOE, and WM. P. CHILTON, for the appellants, made the following points:

1. The chancellor erred in allowing an amendment of the bill, after sustaining the demurrer for multifariousness. The cause having been submitted for final hearing, on bill, answer, demurrer, and proof, the bill should have been dismissed.—1 Dan. Ch. Pr. 481; Bryant v. Peters, 3 Ala. 171; McKinley v. Irvine, 13 Ala. 707; McIntosh v. Alexander, 16 Ala. 90; Boyd v. Hoyt, 5 Paige, 65; Davone v. Fanning, 4 John. Ch. 204; Felder v. Davis, 17 Ala. 425. To allow an election, as was done in this case, after demurrer sustained for multifariousness, causes delay, and enables the plaintiff to ascertain the state of his adversary's proof, as to the cause of action for which he elects to dismiss, before instituting another suit. This mode of experimenting, by blending different causes of action, should not be permitted.

2. The demurrer to the amended bill ought to have been sustained. The bill was wanting in equity, because it showed that the settlement of the administration had been commenced in the probate court, by proceedings instituted by the distributees, and failed to allege any sufficient reason for removing it into the chancery court: the jurisdiction of the probate court having first attached, it could not be divested without sufficient reason. This principle is well settled by the decisions of this court. The proof cannot be looked to, on demurrer, in aid of the defective allegations of the bill.—Story's Eq. Pl. §§ 254, 263, 264; 10 Wheaton, 189; 13 Ala. 681.

3. The demurrer for want of proper parties was well taken. As the bill did not allege that all the debts had been paid, it should have brought the creditors before the court, or been so framed as to allow them to come in and make themselves parties.—Gould v. Hays, 19 Ala. 445. So far as the bill sought to charge the administrator with the proceeds of the sale of the house and lot in Tuscumbia, the sureties on his special bond, whose names are not shown in the bill, were necessary parties.

4. The sale of section four, under the order of the orphans' court, was void, for want of jurisdiction in the court to make the order. This question is presented by the demurrer to the bill for want of equity, and arises on the proof. The court had no jurisdiction to make the order, because, in the first place, the contract between the intestate and McLish being inhibited by the express terms as well as by the policy of the treaty of 1832, the intestate thereby acquired no interest in the land.—See the treaties with Chickasaw Indians, of October, 1832, and May, 1834, in the United States Statutes at large, vol. 7, pp. 386–7, 450–5; Lewis v. Love & Lane, 1 Ala. 335. The order of sale was void for the additional reason, that the land had been conveyed by deed to the heirs of Pettit before the petition for the sale was filed.—Johnson v. Collins, 12 Ala. 322; McCain's Heirs v. McCain's Adm'r, 12 Ala. 510; Mounger v. Burks, 17 Ala. 51. As the court had no jurisdiction to order the sale, the act of the court was *coram non judice* and void.—McCartney v. Calhoun, 11 Ala. 110; Wightman v. Karsner, 20 Ala. 459; Eslava v. Lepretre, 21 Ala. 522; Wainwright v. Saunders, 20 Ala. 604; Thompson v. Brown, 16 Mass. 178; Heath v. Wills, 5 Pick. 145; Hancock v. Hubbard, 19 Pick. 511; Duncan & Hooper v. Stewart, 25 Ala. 414; Martin's Ex'rs v. Williams, 18 Ala. 193. The order of sale being a nullity, the sale was also void; the rights of the complainants in the land, under their deed from McLish, were not affected by it; and the proceeds of the sale are not assets in the administrator's hands, though a court of chancery might hold him liable individually for the money.—Ashurst's Adm'r v. Ashurst's Heirs, 13 Ala. 783; Smith's Heirs v.

Smith's Adm'r, 13 Ala. 335; Martin's Executors v. Williams, 18 Ala. 193; Smith's Distributees v. King, 22 Ala. 561; Duncan & Hooper v. Stewart, 25 Ala. 413; Walker v. Wynne, 3 Yerger, 62–73; Stewart v. Roberts, 1 Yerger, 389.

5. The bond given by the administrator for this money, with Carroll and Barton as his sureties, is void for want of consideration, and for want of authority in the court to take it.—Butler v. Foster, 14 Ala. 323; Governor v. Jackson, 15 Ala. 703; Claunch v. Castleberry, 23 Ala. 92; Hughlett v. Hughlett, 5 Humph. 453. If the sureties are not liable on their bond, they are not liable at all, since they have the right to stand on the precise terms of their contract.—McKay v. Dodge, 5 Ala. 388.

6. The sureties are not estopped by their bond from alleging its invalidity, or showing that the money arising from the sale is not assets. There can be no estoppel where there is no privity between the parties in the character in which the plaintiffs sue, nor where the truth appears on the record by the plaintiffs' only pleading. Comyn's Digest, *Estoppel*, E, 2; Co. Litt. 352; Wheelock v. Henshaw, 19 Pick. 345; Stillman v. Barney, 4 Vermont, 187; Blake v. Tucker, 12 Vermont, 39; Hamilton v. Parish, 1 Dev. 415; Livingston v. McKinney, 2 Murph. 67; Miles v. Miles, 8 Watts & Serg. 135.

7. The sureties on Tarver's general administration bond are not liable for the proceeds of the sale of the house and lot in Tuscumbia, and the chancellor erred in holding them liable.—Aikin's Digest, 176, §§ 1–3; *ib.* 181, § 20; Clay's Digest, 229, § 44; 1 Wms. Executors, 370, as to form of letters of administration; *ib.* 439, as to form of bond; Hughlett v. Hughlett, 5 Humph. 454–73; Henshaw v. Blood, 1 Mass. 43; Prescott v. Tarbell, 1 Mass. 208; Freeman v. Anderson, 11 Mass. 193; Bryant v. Peters, 3 Ala. 170; 3 Humph. 592; Williamson and Wife v. Mason, 23 Ala. 504; Lyman v. Conkey, 1 Metc. 317; Grimes v. Commonwealth, 4 Litt. 1–6; Irvine v. McDowell, 4 Dana, 629; Clay v. Hart, 7 Dana, 10–19; Moore v. Walker's Heirs, 1 A. K. Mar. 488.

R. W. WALKER, with whom was JAMES IRVINE, *contra:*

I. The practice is well settled, in this State, to allow an amendment of the bill after demurrer sustained for multifariousness. The true rule is, that the allowance of the amendment is not a matter of course, but rests in the sound discretion of the chancellor; the exercise of which discretion will not be revised on error or appeal, except in extraordinary cases, and for very cogent reasons.—Marriott v. Givens, 8 Ala. 695, 710; Allen v. Montgomery Railroad Co., 11 Ala. 447; Hunley v. Hunley, 15 Ala. 98; Felder v. Davis, 17 Ala. 425; McIntosh v. Alexander, 16 Ala. 87; Kennedy v. Kennedy, 2 Ala. 609; Lanier v. Driver, 24 Ala. 149; 1 Barbour's Ch. 59, 65; 11 Paige, 166; 1 Hill's Ch. 445; 4 Sm. & Mar. 294; 6 Paige, 29.

II. The chancery court had jurisdiction of the case made by the bill, notwithstanding the institution of the proceedings in the orphans' court, (1st) because a discovery was necessary, and (2d) because the orphans' court was inadequate to grant full relief. The allegations of the bill, that the administrator did not make a full return and inventory of the personal estate; that he privately sold the crop of 1834; that he converted to his own use all the personalty except the slaves; that he used the slaves for four years, rendering no account of their services; and that the complainants are without information in reference to these several matters—show the necessity for a discovery.—Hunley v. Hunley, 15 Ala. 91. The orphans' court had no power to do more than render a decree against the administrator alone, who is alleged and proved to be both non-resident and insolvent. It had no jurisdiction against the executors of Armstead Barton, (Jenkins v. Gray, 16 Ala. 100,) nor against Carroll; and as Tarver was insolvent, a decree of the orphans' court against him would have been only the foundation of two separate actions at law, one against Carroll, and the other against Barton's executors. The bill shows, also, that there were complicated matters of account involved in the settlement, which the orphans' court was incompetent to adjust. Chancery alone was capable of calling all the parties before it, settling the liabilities and adjusting the

20

responsibilities of each, and rendering a comprehensive decree, which would dispose of the whole matter, and give the complainants that full relief which, in any other forum, they would have been compelled to seek by circuitous actions. On these facts, the equity of the bill is sustained by the following cases: Pearson v. Darrington, 18 Ala. 348; S. C., 21 Ala. 176; Pharis v. Leachman, 20 Ala. 677; Gould v. Hays, 19 Ala. 440; Hunley v. Hunley, 15 Ala. 98; Owen v. Slatter, 26 Ala. 551; Dement v. Boggess, 13 Ala. 143; Lamkin v. Heyer, 19 Ala. 228; King & Ansley v. Smith, 15 Ala. 720; Moore v. Armstrong, 9 Porter, 697; 4 Munf. 289; 1 Marsh. 488; Blakey v. Blakey, 9 Ala. 391; Leavens v. Butler, 8 Por. Rep. 399.

III. The demurrer for want of proper parties was not well taken. The creditors are not necessary parties to a bill for distribution, filed after the lapse of eighteen months, unless it is affirmatively shown that there are outstanding debts still subsisting. After the lapse of eighteen months, the complainants were, *prima facie*, entitled to distribution; and if any cause to the contrary existed, it was the duty of the administrator to set it up, and to have the proper parties brought before the court.—Harrison v. Harrison, 9 Ala. 470; Leavens v. Butler, 8 Porter, 392; Graham v. Abercrombie, 8 Ala. 552; 2 Lomax on Ex'rs, 517–18; Mitford's Pleadings, (ed. 1849,) 201; 1 Russ. & My. 656; 4 Dess. 330–342. As to the objection that the sureties on the special bond were necessary parties, it is sufficient to say that it does not appear who they were, nor indeed that any bond was given; nor does the demurrer state their names, so as to enable the complainants to amend.—10 Paige, 445; 19 Ala. 121. The sale would have been valid without such bond.—6 Por. 219; 28 Ala. 164, 218.

IV. The sureties on Tarver's general administration bond are liable for the proceeds of the sales of real estate which went into his hands, including both the house and lot in Tuscumbia, and section four. The validity of the former sale is not controverted; and the liability of the administrator's general sureties for the proceeds of the

Pettit's Adm'r v. Pettit's Distributees.

sale is not now an open question in this State.—Clarke v. West, 5 Ala. 128; Wade v. Graham, 4 Ohio, 126; Wyman v. Campbell, 6 Porter, 219; Ashurst v. Ashurst, 13 Ala. 781. The condition of the general administration bond, binding the sureties for their principal's performance of "all the duties which are or may be by law required of him as administrator," is clearly sufficient to include liability for this money. It was undoubtedly the duty of the administrator to apply for the order of sale, to receive the proceeds of the sale, and faithfully to account for the proceeds. The condition of the general bond is not affected by the fact that a special bond is required before the proceeds of sale can go into the hands of the administrator, and the liability of the sureties is thereby unaffected. See, also, Smith's Distributees v. King, 22 Ala. 558; Bondurant v. Thompson, 15 Ala. 202; 14 Missouri, 116; 11 Sm. & Mar. 303, 313; 10 Vermont, 285; 3 Watts & S. 353; 7 ib. 175. Moreover, Barton's executors, in their answer, refer to the account filed by Tarver, and "admit all the charges against him in that account to be correct;" and the account itself shows that Tarver therein charges himself with the proceeds of the sale of the house and lot in Tuscumbia.

V. The same principles and authorities show the liability of the sureties on the general administration bond for the proceeds of the sale of section four, unless the invalidity of that sale can be successfully maintained on some one of the grounds on which it is attacked. Pettit had bought the land from McLish, had paid $1,000 of the purchase-money, and had died in possession. His equitable interest was subject to be sold by the orphans' court; and, if a sale was necessary for the payment of debts, it was Tarver's duty to apply for an order of sale.—Perkins v. Winter, 7 Ala. 865; Evans v. Matthews, 8 Ala. 99; Jennings & Graham v. Jenkins, 9 Ala. 290; Vaughan & Hatcher v. Holmes & West, 22 Ala. 593; Wyman v. Campbell, 6 Porter, 219, 237; Duval v. P. & M. Bank, 10 Ala. 652.

1. If Pettit died seized of any estate or interest in this land, the subsequent execution of a deed by McLish, con-

veying the legal title to his heirs, did not divest the orphans' court of its power to order a sale. If a decedent is indebted beyond the value of his personalty, and dies possessed of any estate in land, whether legal or equitable, the orphans' court at once acquires a potential jurisdiction over it, and may subject it to sale for the benefit of his creditors; and this jurisdiction of the court cannot be divested by any act of the administrator, heirs, or third person, nor by any subsequent alienation or change of title. If the intestate had a legal title, that legal title descends to his heirs, subject to this paramount lien of creditors; and the heirs cannot, by conveying to a third person, destroy the power of the court to order the sale, or free the land from the statutory charge. If the intestate's title was merely equitable, the heirs cannot place it beyond the jurisdiction of the court by procuring a conveyance of the legal title. In either case, a sale by the administrator, under an order of court, for the payment of debts, avoids such subsequent conveyances. The complainants in this case, by the deed from McLish, take by descent, as heirs, and not by purchase; and the land was assets of their ancestor's estate, liable under the statute for the payments of his debts. These positions are sustained by the following authorities: Vansyckle v. Richardson, 13 Ill. 174; Stillman v. Young, 16 Ill. 318; 11 Humph. 512; Johnson v. Collins, 12 Ala. 322; 1 Ohio, 182; 6 Ohio, 227, 238; 8 Ohio, 217; 9 Ohio, 145; 10 Ohio, 180; 3 Ohio St. R. 494, 502; 26 Miss. 531, 543; 16 Peters, 25, 62; Grignon v. Astor, 2 How. (U. S.) R. 319, 343; McPherson v. Cunliff, 11 Serg. & R. 422; Leavens v. Butler, 8 Porter, 389; Wyman v. Campbell, 6 Por. 234; 6 John. Ch. Rep. 360; 9 Dana, 102; 4 Mass. 354; 5 Mass. 241; 7 Mass. 292; 5 Ohio, 86; Seymour v. Seymour, 22 Conn. 272; 1 Barbour, 75, 79; 13 Geo. 1, 9; 4 Kent's Com. (m. p.) 438; 9 N. H. 168; 4 Barr, 32.

The cases of McCain v. McCain, 12 Ala. 510, and Mounger v. Burks, 17 Ala. 48, cited to this point by the appellant's counsel, are unlike the case at bar. In each of those cases, the sale was made for the purposes of distribution among the heirs; in this case, for the payment

of debts and distribution. In this case, moreover, the deed of McLish was not effectual to convey the legal title to the heirs. It was made without an order of court, when the heirs were infants, and, consequently, incapable of accepting it; and the administrator, at whose instance it was made, did not represent them in this matter, and had no right to act for them. The deed, therefore, is inoperative as a conveyance, for want of a sufficient delivery and acceptance.—4 Kent's Com. 446; Jackson v. Phillips, 12 Johns. 418; 23 Wendell, 43; 12 Illinois, 135; 2 Wendell, 308; 10 Wendell, 310. This case is unlike that of McCain v. McCain, *supra*, for the additional reason, that Barton's executors are here estopped from insisting that the change of title ousted the jurisdiction of the orphans' court. Barton was a subscribing witness to the deed from McLish to the heirs, and, therefore, knew of the change of title; and yet he was one of the two witnesses on whose testimony the order of sale was granted. Under these circumstances, he cannot now be heard to deny the right of the administrator to make the application, or the power of the court to grant the order.—4 Harrington, 521; 6 Barbour, 589; 1 Harper's Ch. 47;· Riley's Ch. 213; Jennings v. Jenkins, 9 Ala. 289; Evans v. Matthews, 8 Ala. 102.

2. The validity of the sale is attacked on the further ground, that the contract between McLish and Pettit was illegal, because prohibited by the treaty of 1832 with the Chickasaw Indians. The contract between McLish and Pettit consists of two distinct agreements: 1st, to sell and convey for $12,800, *when* and *if* the treaty should be so modified as to give McLish the right to sell; and, 2d, to lease the land, on the terms specified, in the event the treaty was not modified. These two agreements are separate and distinct; they are to take effect on different contingencies, and accomplish different purposes; each is independent of the other, and complete in itself. The latter agreement is null; but its illegality does not affect the validity of the former, which, instead of contravening the provisions of the treaty, was only to become operative when the treaty was modified as contemplated. The

agreements being severable, the court will sustain and
enforce the legal, while it avoids the illegal.—Pleasants
v. Pleasants, 2 Call, 270, 295; Alston v. Coleman, 7 Ala.
797; 1 Munford, 303; 20 Pick. 105; 10 Yerger, 309;
5 Mees. & Welbs. 462; 69 E. C. L. 528; Bates & Hines
v. Bank, 2 Ala. 457; Whitsett v. Womack, 8 Ala. 466;
United States v. Bradley, 10 Peters, 343, 360; Leavitt v.
Blatchford, 5 Barbour, 9; Newman v. Newman, 4 M. & S.
66; Pigot's case, 11 Co. 27; Parsons on Mercantile Law,
34, 35; 1 Smith's L. C. (ed. 1855,) 502; 8 Porter, 497;
Greenwood v. Bishop of London, 1 E. C. L. 373; Doe d.
Thompson v. Pitcher, 1 E. C. L. 653; 11 Mees. & W.
652; 16 Mees. & W. 346, 352; 26 E. C. L. 190; Vandyke
v. Van Buren, 1 Johns. 345; 3 Grattan, 173; 5 Serg.
& R. 139; 8 East, 246; 15 East, 443; 8 T. R. 411;
3 Metcalf, 159; 8 Foster, (N. H.) 290; 8 Cowen, 20;
13 East, 87; 59 E. C. L. 344; Black v. Oliver, 1 Ala. 449;
18 Penn. St. R. 48; 5 Johns. 272; 2 Ld. Raymond, 1456;
2 Ohio St. R. 519; 11 East, 165; Wood v. Benson, 2 Cr.
& Jer. 94; S. C., 2 Tyrwh. 93.

3. In May, 1834, before Pettit died, the treaty of 1832
was modified as contemplated in the contract. The con-
tract then became binding on McLish, and he so recog-
nized it: he retained the $1,000 paid him by Pettit,
received the balance of the purchase-money from Tarver,
permitted Pettit (and afterwards Tarver) to keep the
possession of the land under the contract, and afterwards
executed conveyances in the manner suggested by Tarver.
Although a contract, when made, was prohibited by law;
yet, if the statutory prohibition is afterwards removed,
and the obligor then recognizes and ratifies the contract,
such confirmation makes the contract valid and binding
from the time of the change of the law.—19 E. C. L.
192; 21 Vermont, 99; 24 Vermont, 317; 10 Barbour, 406.

4. At all events, McLish is the only person who could
ever have complained of the illegality of this agreement;
and he having recognized and confirmed it, no third per-
son, or stranger to the contract, can be heard to question
its validity.—Richardson v. Kimball, 28 Maine, 463; Ells-
worth v. Mitchell, 31 Maine, 247; Brown v. Lipscomb,

9 Porter, 472; Bousfield v. Wilson, 16 Mees. & W. 184. The purchaser at the administrator's sale could not have defended an action on the notes for the purchase-money, on the ground that Pettit had no estate in the land; and this conclusively shows that the money, when received, was assets in the administrator's hands.—Worthington v. McRoberts, 7 Ala. 814; S. C., 9 Ala. 297; Jennings v. Jenkins, 9 Ala. 288; Pool v. Hodnett, 18 Ala. 752; Evans v. Matthews, 8 Ala. 99; 27 Miss. 852; 15 Illinois, 295; 4 Barr, 171; Lamkin v. Reese, 7 Ala. 719. The idea that an administrator or his sureties can be allowed to set up the illegality of the contract by which the intestate obtained property of which he died in possession, in order to avoid liability for it as assets of the estate, when considered in the light of its practical results, is most preposterous: it would allow a conversion by the administrator to his own use, without liability on the part of his sureties, of money won at cards by the intestate years before, or property of which he had been in the undisturbed possession until he had acquired a perfect title by the statute of limitations.

5. Tarver and his sureties are estopped by their acts from alleging the invalidity of the contract between Pettit and McLish. Tarver paid one-half of the purchase-money for the entire tract, out of the assets of the estate; and claimed credits, both before the probate court and in his answer to the bill, for these payments. These acts and declarations on his part, in the course of his official transactions, which bind alike him and his sureties, estop them from setting up the invalidity of the contract.—Dumas & Co. v. Patterson, 9 Ala. R. 484; Evans v. Keeland, 9 Ala. Rep. 42; Wilson v. Green, 25 Vermont, 450. If the contract was not valid and binding, Tarver committed a *devastavit*, for which he and his sureties are liable, in paying the balance of the purchase-money; and the appellees insist, that if they are not liable for the proceeds of the sale, they must necessarily be chargeable with the amount of the purchase-money paid by Tarver under the illegal contract, with interest thereon,

and with the $1000 paid by Pettit to McLish, which Tarver failed to sue for and recover.

6. If the fact that Pettit had an estate in the land was a jurisdictional fact, the decree shows that its existence was judicially ascertained by the court. It is, therefore, *res adjudicata*, and cannot be now questioned.—Hamner v. Mason, 24 Ala. 480; Gunn v. Howell, 27 Ala. 663; Mather v. Hood, 8 Johns. 36.

VI. The recitals of Carroll's bond estop him from denying the validity of the order of sale.—Stevenson v. Miller, 2 Litt. 306; 4 Blackf. 435; 25 Ala. 566; 5 Dana, 55; Jemison v. Cozzens, 3 Ala. 636; Mead v. Figh, 4 Ala. 279; 1 McMull. Eq. 369, 374; 4 Harr. 521; 10 Eng. Law and Eq. 279, 288; 1 McLean, 384; 3 English, 345. Even if the bond was void as a statutory bond, yet, being founded on a valuable consideration, it is good as a common-law bond.—2 Porter, 493; 1 Ala. 316; 5 Ala. 306; 10 Ala. 829; 8 Ala. 46; 3 Watts & S. 517.

VII. The complainants below were clearly entitled to interest on the balance reported against the administrator, up to the rendition of the final decree; and the omission to decree it to them was simply an oversight, which this court will correct.

RICE, C. J.—The jurisdiction of the orphans' court, to decree a sale of land, was derived solely from our statutes, and was a special and limited jurisdiction. Its decree for a sale was a nullity, unless its record disclosed every fact essential to its jurisdiction. No intendment that it had jurisdiction to decree a sale of realty was allowable.—Bishop's Heirs v. Hampton, 15 Ala. Rep. 761; same case, 19 Ala. 792; Wyatt v. Rambo, 29 Ala. 510.

In the case at bar, the decree of the orphans' court of Franklin county, upon the petition of the administrator of Hugh Pettit, deceased, for the sale of section 4, in township 4, of range 13, as therein described, and all the proceedings in the suit which was commenced by that petition, are assailed for want of jurisdiction in respect to the subject-matter; and if the jurisdiction of that court

cannot be sustained ·under the first section of the act of 1822, there no law to sustain it.   That section is in the following words : " It shall be lawful for an administrator of any deceased intestate, or the executor of any deceased testator, who has not power by the will of the testator to sell real estate for the purpose of paying debts, or to make more equal distribution among the heirs, devisees, or legatees, to file a petition in the orphans' court of the county in which letters of administration or letters testamentary have been granted, setting forth that the personal estate of his intestate or testator (as the case may be) is not sufficient for the payment of the just debts of such intestate or testator, or that the real estate *of such testator or intestate* cannot be equally, fairly, and beneficially divided among the heirs or devisees of such intestate or testator, without a sale of the real estate; setting out and particularly *describing* in such petition *the estate proposed to be sold,* and the names of the heirs or devisees of such intestate or testator," &c.—Clay's Digest, 224, §§ 16–22.

It is fully settled, that proceedings in the orphans' court, under the act above cited, " are *in rem,* against *the estate of the decedent;*" and that when the jurisdiction of that court attaches at all, it " attaches *quoad the thing* "—that is, " *the estate of the decedent.*"—Duval's Heirs v. Pl. and Mer. Bank, 10 Ala. 636; Matheson's Heirs v. Hearin, 29 Ala. 210; Smith v. Smith, 13 Ala. 329.

The unavoidable sequence from these positions, and from the provisions of the above mentioned act, is, that although the jurisdiction can never attach without the filing of a petition by the executor or administrator, (McCartney v. Calhoun, 11 Ala. 110, and cases cited *supra;*) it cannot attach even on the filing of a petition, which fails to show by its allegations that the testator or intestate of the petitioner, at the time of his death, had or owned either a legal or equitable right or interest in the real estate therein proposed to be sold—a right or interest, which, in its nature, was descendible to his heirs. Rhem v. Tull, 13 Iredell, 57; Johnson v. Collins, 12 Ala. 322; Buckmaster v. Harrop, 7 Vesey, 342; Broome v. Monck, 10 Ala. 607.

In the petition filed in the orphans' court of Franklin, for the sale of said section 4, the administrator does not directly aver that his intestate, at the time of his death, had any such right or interest in said section; but, omitting such averment, he states specially certain facts, from which he relies upon the court to draw the conclusion, that his intestate, at the time of his death, did have such right or interest in said section. If, from the facts thus stated, *the conclusion of the law* is, that the said intestate, at the time of his death, did have such right or interest in said section, the orphans' court of Franklin had jurisdiction; otherwise, it had not.

The only foundation for any such right or interest in said intestate, disclosed by the facts stated in the petition, is the contract evidenced by the written agreement, executed on the 2d day of December, 1833, by and between him and John McLish, of the Chickasaw nation; which agreement was made part of the petition, and a copy of which forms part of the bill in the case at bar.

The view of the contract hereinafter taken, renders it unnecessary to say anything as to the correctness of the decision in Pleasants v. Pleasants, 2 Call's Reports, 270, cited in Alston v. Coleman, 7 Ala. 795; for, conceding that decision to be correct, it relates to the validity of the direction in a will as to personal chattels of the testator,—a direction entirely executory and contingent, looking only to the future, and not purporting to pass any interest *in præsenti*, or any interest *in futuro* which could conflict with the law as it existed at the time the interest was designed to pass. By no just rule can that decision be applied to a transaction or thing materially different *in its nature* from that which was presented for adjudication in that case.

The lands embraced by the contract now under consideration, including said section 4, constituted the reservation of said McLish, as one of the Chickasaw nation, under the treaty entered into between that nation and the United States, on the 20th October, 1832; which provides, among other things, that the reservations selected under it "shall be held and occupied by the Chickasaw

people, uninterrupted, until they shall find and obtain a country suited to their wants and condition." The treaty did not invest the reservees with the title; but, on the contrary, the treaty, and the supplementary and explanatory articles thereto, agreed upon on the 22d October, 1832, clearly prohibited each reservee from either selling or leasing his reservation.—7 U. S. Statutes at large, 381–390; Lewis v. Love & Lane, 1 Ala. 335.

The parties to the contract were the said McLish, the Chickasaw reservee, and the said Hugh Pettit, who was not one of the Chickasaw people, but a white man and citizen of the United States. The contract was not a mere agreement on the part of McLish to sell, and on the part of Pettit to buy, for the sum of $12,800, payable as therein shown, the said reservation of McLish, in case the said treaty should thereafter be so modified "as to give to said McLish said lands in fee-simple with power to sell the same." It was something more than that, and something in *its nature* different from that. The twelve thousand eight hundred dollars was all that Pettit was to pay, and all that McLish could in any event receive from him. Pettit did not agree to pay that sum in consideration of the mere agreement of McLish to sell him his reservation for that sum, in the event of the modification of the treaty as contemplated; but he agreed to pay it, and actually paid one thousand dollars of it at the time of the contract, in consideration of the agreement of McLish to sell him the reservation in the event of the modification of the treaty as comtemplated, *and in further consideration* of the stipulation, that "in case there is no alteration in the treaty, the said Pettit has the use and benefit of said plantation (the reservation of McLish) above mentioned for two years, free of rent." The promise of the $12,800 by Pettit was made to induce, and did induce McLish to do *two things*—to-wit, to agree to sell his reservation to Pettit, if and when the treaty should be modified so as to allow it, *and* to give him, at the *very instant the contract was made, the possession and use of the reservation,* to be continued from thence for two years, even if there should be "no alteration in the

treaty." The contract is clearly entire and indivisible. There were two considerations for the agreement or promise of Pettit. One of them, to-wit, that he should instantly have the possession and enjoyment, the use and benefit, of the reservation of McLish, and should continue to have the same for two years, even if the treaty were not altered, was illegal. The transfer, *in præsenti*, of the use and possession of the reservation, was in conflict with the treaty, and adverse to its policy. The contract must be held void, upon the principle, that if there be a legal and an illegal consideration for the same entire contract or promise, the whole contract is void.—Lewis v. Love & Lane, *supra ;* Kennett v. Chambers, 14 How. (U. S. Sup. Ct.) Rep. 38 ; McElyea v. Hayter, 2 Porter, 148 ; Tennison v. Martin, 13 Ala. 21 ; Addison on Con. 147 ; Chitty on Con. (edition of 1851,) 575, 597 ; Collins v. Blautern, with the notes thereon, as published in 1st Smith's Leading Cases, (edition of 1855,) marginal pages, 153–172 ; Shackell v. Rozier, 2 Bing. N. C. 646 ; Waite v. Jones, 1 Bing. N. C. 662 ; Howden v. Haigh, 11 Ad. & El. 1033 ; Booth v. Hodgson, 6 Term R. 405, 409 ; Fivaz v. Nicholls, 2 M., G. & S. (52 Eng. Com. Law Rep.) 500.

After the treaty was modified, as it appears to have been, it may be that Pettit and McLish could have made *a new contract*, similar to the one we have been considering. But nothing of that kind was done ; and it is very clear that the contract we have above pronounced upon, was incapable of confirmation, because it falls within the influence of the general rule, that a contract which is void, either by a positive law, or upon principles of public policy, is deemed incapable of confirmation. 1 Story's Eq. Jur. § 306 ; Shippey v. Eastwood, 9 Ala. 198 ; Boutette v. Melendy, 19 New Hamp. R. 196 ; Allen v. Deming, 14 New Hamp. R. 133.

As the contract was void for the reasons above stated, and was incapable of confirmation, it did not, and could not, confer upon Pettit any right or interest, either legal or equitable, to any land therein mentioned, (Camden v. Anderson, 5 Term Rep. 709 ; Fambro v. Gantt, 12 Ala. 298,) nor upon his administrator any authority to use the

money or assets of the estate to pay for any land embraced by it.—Buckmaster v. Harrop, Broome v. Monck, and Johnson v. Collins, *supra*.

From these premises we deduce the conclusion, that it does not appear from anything contained in the petition of the administrator of Hugh Pettit, deceased, for the sale of said section 4, that the said Pettit, at the time of his death, had any right or interest, either legal or equitable, in or to any part of that section; that consequently the orphans' court of Franklin county had no jurisdiction to order a sale of any part of said section; that its decree for a sale of any part of the same, as well as the sale made under that decree, and the bond executed by the administrator and Carroll for the application of the proceeds of that sale, must be deemed and taken as utterly void, (Watkins v. Basset, 3 Ala. 707,) and that the administrator and the executors of A. Barton, the surety on his general administration bond, are liable, and must be held to account in this suit, for all the moneys or assets of the estate used by the administrator in paying for said section 4, or any other land embraced by the contract between McLish and Pettit, herein above declared void, with lawful interest thereon from the time they were so used, unless the complainants elect to relieve them from accounting in this suit in that respect, and to bring another suit for said section 4, or for the proceeds which resulted from the sale of it under the aforementioned void order of the orphans' court. But for *the proceeds of that sale*, neither the administrator nor any of his sureties or their representatives can be held liable in the present suit, which, as it now stands, is a mere suit for the settlement of the administration of Tarver and of the estate. The proceeds of the void sale are not assets, and cannot be treated as assets.

It appears that, on the petition of the administrator, lot No. 154 in the town of Tuscumbia was sold, in 1836, for the sum of $3,155, by commissioners under an order of the orphans' court of Franklin county, made by virtue of the act of 1822; and that the proceeds of the sale were received by the administrator. The validity of the sale

is not questioned by the parties, but is a conceded fact in this case. The executors of A. Barton, the surety on the general administration bond, claim entire exemption from liability for the proceeds of that sale. They base this claim to exemption upon the single ground, that the surety on the general administration bond is not liable for any part of the proceeds of land sold under a valid order of the orphans' court. If they fail to sustain this claim to exemption, they then contend that the surety on the special bond, required by the 5th section of the act of 1822, (Clay's Digest, 225, § 20,) is jointly liable with the surety on the general administration bond, and is, therefore, a necessary party to a suit like this.

The act of 1822 treats the petition of the administrator for the sale of land, as the commencement of a suit by him; "a proceeding *in rem* against the estate of the decedent," but nevertheless a suit.—Cloud v. Barton, 13 Ala. 347; Bonner v. Greenlee, 6 Ala. 411. The object of the suit is to convert the land into money, and to put the money in his hands. It is the duty of the court to "render a final decree in the cause."—Clay's Digest, 225, §§ 20, 21. The court is authorized, but not imperatively required, to direct in that final decree the payment and application of the money arising from the sale.—*Ib.* The sale, when made, is to be made by commissioners appointed by the court; and is a sale by the court, through the commissioners as its ministerial agents, over whose acts it retains a controlling power, until it has ratified them, and made a final decree.—Jennings v. Jenkins, 9 Ala. 285; Worthington v. McRoberts, 7 Ala. 297. The administrator is not to receive the proceeds of the sale, until he enters into bond, with sufficient security, (the special bond above referred to,) "conditioned for the faithful payment and application of the money arising from such sale, according to the final decree."—Clay's Dig. 225, § 20. If he enters into that bond, he is entitled to receive them. If he enters into that bond, and receives them, his surety on it can only be made liable for his failure to pay and apply them "*according to the final decree.*" If that decree does not make or contain

any direction as to their payment or application, as it may not and often does not, there cannot be a breach of that special bond, nor any recovery thereon. In the present case, it does not appear that "the final decree" made or contained any direction as to the payment of the proceeds of the sale of said lot No. 154; and, therefore, no breach of the special bond is shown. And as, upon the facts as presented in this case, the sureties on that bond do not appear to be liable in any way for any part of the proceeds of said lot, we must decide that they were not necessary parties.

But the condition of the general administration bond is much more comprehensive than that of the special bond: it is that the administrator "shall well and truly perform all the duties which are or may be by law required of him as such administrator." The question as to the liability of his surety on that bond is narrowed down to this, whether it was, by law, the duty of the administrator, after the proceeds of the said lot were received by him, under the circumstances disclosed in the record, to account for them to the heirs.

Upon the death of the intestate, (Hugh Pettit,) that lot descended to his heirs, and they were instantly invested with the title. But their right or title was subject to the exercise of the *statute power* of the administrator.—Patton v. Crow, 26 Ala. 426. Conceding that, independent of our statutes, the administrator had nothing to do with the real estate of the intestate, and no power over it; yet the act of 1822, above cited, conferred upon him such power in two distinct classes of cases, to-wit: 1st, when the personal estate was insufficient to pay the debts of the intestate; 2d, when the real estate could not be equally, fairly and beneficially divided among the heirs without a sale thereof. By the assertion and exercise of that power, he, *as administrator*, in the mode pointed out by the act of 1822, has procured a valid and complete sale, whereby the title of the heirs to the lot is divested; and *as administrator* he has, under the same statute, also procured the possession of the proceeds arising from that sale. It would be strange, indeed, that a statute should

arm the administrator with power to bring about a sale, which would destroy the title of the heirs, and put the money arising from the sale of their land into his hands, *without any liability on his part to account for that money to them!* We have no statute which produces any such singular and unjust result. On the contrary, whenever the administrator, by the assertion and exercise of *his statute power*, has procured a valid and complete sale of land, divesting the title of the heirs, and has also obtained the moneys arising from such sale, it as as clearly his legal duty to account for such moneys, as for any assets of the estate. If he shows that they have been properly applied, or must necessarily be applied in payment of the debts of the estate, that is a sufficient accounting for them to the heirs. So, if he shows that "the final decree in the cause," commenced by his petition, directed such moneys to be paid and applied otherwise than to the heirs, and that decree remains unreversed and of force, that may, perhaps, be a sufficient accounting for them to the heirs. But where, as here, nothing of that kind appears, the failure of the administrator to pay or account to the heirs for such moneys is a breach of the condition of his general administration bond, for which he and his sureties on that bond are liable to the heirs.—Clarke v. West 5 Ala. 117. We decide, therefore, that the executors of A. Barton, the surety on the general administration bond, are not exempt from liability to the heirs, for the proceeds of the sale of said lot 154; and that there is no error in the decree, so far as it charges them with that liability.

As to the amount (to-wit, $519 07,) mentioned in voucher No. 98, there is some doubt whether it was allowed to the administrator in the account reported by the register, as corrected by the chancellor.

Upon a careful examination of the other questions raised by the assignments of error on the part of appellants, our conclusion is, that in the decision of them by the chancellor there was no reversible error. If reasons or authorities are deemed necessary to support this conclusion, they will be found in the decree of the chancellor,

and in the brief of the appellees' solicitors; and we deem it unnecessary to swell this opinion by a repetition of the reasons or authorities.

There is only one cross assignment of error on the part of the complainants, James T. Pettit and others. That one raises the question, whether the chancellor should not, in his final decree rendered at the May term, 1856, have allowed interest to the complainants, from the 1st day of May, 1855; that being the day up to which the interest account, as reported by the register and confirmed by the chancellor, had been brought. It is evident from what we have decided above, that the administrator was improperly charged, in the decree of the chancellor and report of the register, with the proceeds of the sale of said section 4, and interest thereon; but that, as to all other items or matters charged against him in the report of the register, as corrected by the final decree of the chancellor, the administrator and the executors of A. Barton, the surety on his general administration bond, have no right to complain. The proceeds of the sale of said section 4, and interest thereon, should have been stricken out of the account reported by the register; but, as all the other items and matters charged against the administrator in the report of the register are free from any reversible error, interest in respect to them in the aggregate should have been allowed from the 1st day of May, 1855. And in not thus allowing interest, the chancellor erred.

The decree of the chancellor is reversed, so far as it relates in any manner to the proceeds of the sale of said section 4 under the void order of the orphans' court, and so far as it interposes any obstacle to holding the administrator of Hugh Pettit, deceased, and the executors of A. Barton, his surety on the general administration bond, accountable and liable in this suit, (as must be done by the chancellor, unless waived by election of complainants hereafter to be made,) for the moneys or assets of the estate used by the administrator in paying for said section 4, or for any other land embraced by the contract between said Hugh Pettitt and McLish, with lawful interest thereon

from the time they were so used; and so far as it might operate to prevent the allowance of the interest in favor of the complainants from the 1st May, 1855, in respect to the aggregate of all the items or matters charged against the administrator in the report of the register, except the proceeds of the sale of said section 4 and interest thereon; and so far as it can operate to prevent a full inquiry as to voucher 98, relating to the $519 07 above mentioned. In all other respects, the decree of the chancellor is affirmed. The cause is remanded for further proceedings not inconsistent with this opinion.

The appellees (the complainants in the original bill) must pay the costs of the appeal taken by the appellants (the respondents in the original bill.) But the appellants must pay the costs on the cross appeal and cross assignment of error by the complainants in the original bill.